**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 92-1116
Summary Calendar

In Re Grand Jury Proceedings
     Jean Auclair.


                    VICTOR FEAZELL,
                              Appellant.


        Appeal from the United States District Court
            For the Northern District of Texas


                    ( May 1, 1992 )


Before POLITZ, Chief Judge, KING and EMILIO M. GARZA, Circuit
Judges.


POLITZ, Chief Judge:

     Victor Feazell appeals an order requiring Charles Burton, his

attorney, to testify before a grand jury about conversations with

Feazell and rejecting Feazell's invocation of the attorney-client

privilege.  Concluding that a valid attorney-client privilege

exists, we reverse.


                    Background

     The facts underlying this appeal bear a close recounting.

This matter arises out of an ongoing criminal proceeding. On July 2, 1991 a federal grand jury in the Western District of Texas indicted Jean Auclair for mail fraud and for false declarations to a federal court. Auclair was accused of participating in a scheme involving a fraudulent lease between herself and Joseph V. Giffuni, and she was accused of committing perjury in a civil action to enforce the lease against Giffuni's estate. Auclair testified in that trial that Giffuni signed the lease in her presence in Feazell's law office. Upon conclusion of the trial the government sought and obtained the indictment.

Auclair moved to recuse Judge Walter Smith of the Western District of Texas on the grounds that Feazell was a material witness in the criminal controversy regarding the Giffuni lease and that Judge Smith had testified in a prior trial that Feazell's reputation for truthfulness was bad. That testimony had received wide coverage in the local Waco press. Feazell's involvement in the Auclair case included: (1) drafting the Giffuni lease; (2) testifying in the lease litigation that Giffuni had executed the lease in his presence; and (3) having his secretary, Diane Sanders, type the lease and, allegedly on his instructions, perjuriously testify that Giffuni had signed the lease in Feazell's office. Judge Smith recused himself and transferred the case to the Northern District of Texas. It was assigned to Judge Jerry Buchmeyer.

On December 9, 1991 an FBI agent served a grand jury subpoena on Feazell's secretary, commanding her appearance before the grand

2

jury investigating the Auclair matter. She immediately called Feazell in Austin from her home in Waco. Feazell explained her obligations under the subpoena and offered to retain an attorney to advise and represent her. Her husband, Mike Sanders, joined the conversation and demanded that Feazell get an attorney for his wife who "wasn't going to jail for anyone." That afternoon they went to Feazell's home. Feazell attempted to contact Roy Minton, an attorney who previously had represented him, but Minton was not available. Feazell arranged an appointment with Charles Burton, one of Minton's law partners, for the following Friday.

The following *mise-en-scene* is based on the testimony of Diane and Mike Sanders and Burton at a hearing before Judge Buchmeyer on February 7, 1992. On December 13, 1991 Feazell and Diane and Mike Sanders journeyed together to Burton's office for the appointment Feazell had arranged. The four met and conferred as a group. Feazell gave Burton an account of the "facts" of the situation. Burton then met with both Sanders together and then with each separately. Finally he met separately with Feazell. When Burton met with Diane Sanders alone she first sought assurances that he would hold their discussions in confidence. Receiving this assurance, she told Burton that Feazell had been lying and she then told Burton the "truth." When Burton met with Mike Sanders alone he told Burton that his wife's account was the "truth." After each Sanders met with Burton, Feazell asked about their discussion. Neither was forthcoming; Diane Sanders said she had confirmed Feazell's account and Mike Sanders said they spoke only about the

3

Sanders' marriage. Burton declined to discuss his separate conversation with Feazell. After the round of separate interviews, Burton informed Diane and Mike Sanders that he could not represent either of them because of potential conflicts.

Shortly after the meeting with Burton, Diane Sanders was arrested by the FBI. The record before us does not reflect the charge. She attempted to contact Burton and then retained Joe Lehman as her counsel. The next day she was hospitalized for a stress-related problem which required immediate surgery. While she was recuperating, she and her husband signed a form purporting to waive any attorney-client privilege existing between them and Burton. Diane Sanders also gave the FBI a statement in which she admitted that she had lied in the civil trial about the signing of the Giffuni lease.

Following these developments, the federal prosecutor sought to question Burton about the conversations during the meeting on December 13, 1991 with the Sanders couple and Feazell. Burton declined to answer those questions, asserting the attorney-client privilege. The prosecutor responded with a subpoena for Burton to appear in Waco on February 11, 1992 before the Western District grand jury investigating Auclair. Apparently the prosecutor informed Judge Buchmeyer that Burton would likely invoke the attorney-client privilege in his appearance before the grand jury. On February 5, 1992 the court caused Burton, Feazell, Mike and Diane Sanders, and their counsel to be notified of a hearing to be held in Dallas on February 7, 1992. Burton's attorney inquired as

4

to the nature of the hearing but was given no information.  No pleadings were filed; no oral advice was given by the prosecutor or court personnel.

As the February 7, 1992 hearing began Feazell's attorney inquired of the court:  "May I respectfully ask the Court what we are proceeding on so that I know what I'm required to do?"  The court responded by first referring to a non-existent government motion and then stated, albeit a bit vaguely, that there had been an assertion of attorney-client privilege.  The prosecutor interrupted with an explanation of the proceedings -- Burton had been subpoenaed to appear before a grand jury in Waco, he was expected to invoke the attorney-client privilege when questioned, Judge Buchmeyer's court, to which the matter had been referred after Judge Smith recused, was 100 miles distant from the grand jury, thus presenting an inconvenience when and if Burton declined to answer and a motion to compel was needed.  With this the hearing proceeded.  Diane Sanders and Burton testified.  Burton's counsel urged the court to conduct an *in camera* examination of Feazell, suggesting that such a discussion would clearly show Feazell's expectation that his meeting with Mike and Diane Sanders and Burton would result in Burton representing all three of them.  The district court rejected the proposal.

After hearing arguments of counsel the court ruled that Burton was obliged to testify to the grand jury about the contents of his separate conversation with Diane Sanders on December 13, 1991, as well as to the conversation when he and Feazell and the two Sanders

5

met jointly. The court held that Diane Sanders had waived her attorney-client privilege for her separate interview and that any one of the three could waive the privilege for the joint discussions. Finally, the court stated that there was no evidence of a joint defense agreement and even if there had been the court's ruling would be the same.

An order issued in accordance with this ruling and the court declined to stay the order pending appellate review. On emergency motion by Feazell we granted a stay and expedited his appeal of that portion of the order directing Burton to testify about the pre-representation interview with Burton in the presence of Diane and Mike Sanders on December 13, 1991. The National Association of Criminal Defense Lawyers was permitted to file an amicus brief because of the importance of the issue presented.


## Analysis

At the threshold we note serious concern about the juridical basis, nature, and format of the February 7, 1992 proceedings which resulted in the order which is the subject of this appeal. We find no motion or other filing by the government invoking the court's preemptive intervention in the anticipated reluctance of an attorney to testify about matters told to the attorney by a client. Efforts by counsel to learn of the nature of the proceedings, which the affected persons were notified by telephone to attend, were either rebuffed or ignored. We are told that the driving force was the desire of the United States Attorney to avoid an inconvenience

6

or delay in a grand jury investigation. It ought to be manifestly apparent that the mere present or potential inconvenience to the United States Attorney, a federal grand jury, or, for that matter, the court, is not an adequate basis for abrogation of fundamental due process tenets, the Federal Rules of Criminal Procedure, or local court rules. **In re Medrano**, 956 F.2d 101 (5th Cir. 1992).

The Federal Rules of Criminal Procedure permit motions to be made orally or in writing. Fed.R.Crim.P. 47 requires the motion to state the grounds upon which it is made and the relief sought. Fed.R.Crim.P. 45(d) requires that written motions be served not less than five days before the time specified for the hearing. The Local Rules of the Northern District of Texas stipulate that "motion practice in civil and criminal cases is controlled by the Uniform Requirements on Motion Practice" and Local Rules 5.1-5.5. The Uniform Requirements mandate either a brief, or certificate of conference or service, for every motion.[1] Local Rule 5.1(a) requires the filing party to confer with all other parties to ascertain whether the motion will be opposed.[2] Local Rule 5.1(c) requires that contested motions include (i) a certificate that the Rule 5.1(a) conference was held and the reasons why agreement could not be reached, or (ii) a certificate explaining why the conference

---

[1] United States District Court for the Northern District of Texas, Local Rule Appendix I. Uniform Requirements on Motion Practice (1991).

[2] United States District Court for the Northern District of Texas, Local Rule 5.1(a).

7

could not be held.[3]  Local Rule 5.1(d) requires a proposed order and brief to accompany each opposed motion.[4]  Local Rule 5.1(e) provides ten days for the opposing party to respond.[5]  The Local Rules do not except oral motions,[6] and these local rules have the force of law.  **United States v. Hvass**, 355 U.S. 570 (1958); **In re Medrano**.  Nonetheless, because Feazell did not raise on appeal the issue of procedural due process, and because of the fundamental importance we perceive in the legal issue raised in this appeal, we address the merits.

Attorney-Client Privilege

The application of the attorney-client privilege is a "question of fact, to be determined in the light of the purpose of the privilege and guided by judicial precedents." **Hodges, Grant & Kaufman v. United States Government**, 768 F.2d 719, 721 (5th Cir. 1985).  The clearly erroneous standard of review applies to the

---

[3]     United States District Court for the Northern District of Texas, Local Rule 5.1(c).

[4]     United States District Court for the Northern District of Texas, Local Rule Appendix 5.1(d).

[5]     United States District Court for the Northern District of Texas, Local Rule Appendix 5.1(e).

[6]     We note that the local rules for the United States District Court for the Western District of Texas are even more stringent:  All "motions in criminal cases . . . shall be in writing."  United States District Court for the Western District of Texas, Local Rule CR-6 (1991).

8

district court's factual findings.  Fed.R.Civ.P. 52(a).  **Bryram v. United States**, 705 F.2d 1418 (5th Cir. 1983).  We review the application of the controlling law *de novo*.[7]

All parties agree that if the attorney-client privilege is applicable and not waived, then Burton cannot be forced to testify about the December 13 conversations with Feazell.  Beyond this simple given, agreement between the parties is not extant.  The briefs contain extensive discussion on the issues of the existence of a common or joint defense privilege[8] and whether such privilege has been proved by the facts at bar.  The cases cited by the parties and by the amicus generally involve attorney-client privilege questions concerning matters arising after acceptance of representation.  We perceive, however, that there is a priming issue in the resolution of this appeal -- the scope of the attorney-client privilege in an instance of declined representation.

A now venerable rule emanating from the privilege is that "communications made in the course of preliminary discussions with a view to employing the lawyer are privileged though employment is

---

[7] Factual findings made under an erroneous view of the law are not binding on the appellate court.  S. Childress & M. Davis, Federal Standards of Review, § 2.16 (2d ed. 1992) citing **Johnson v. Uncle Ben's, Inc.**, 628 F.2d 419 (5th Cir. 1980).

[8] Sometimes referred to as the common interest rule. **United States v. Schwimmer**, 892 F.2d 237 (2d Cir. 1989).

not . . . accepted."[9]  As one court explained:

> No person could ever safely consult an attorney for the
> first time . . . if the privilege depended on the chance
> of whether the attorney after hearing the statement of
> facts decided to accept employment or decline it.

**Denver Tramway Co. v. Owens**, 20 Colo. 107, 36 P. 848 (1894).[10]  No less may be said for persons who consult an attorney together as a group with common interests seeking common representation.[11]  As Judge Rubin explained in an earlier case:

> Because the privilege protects only confidential
> communications, the presence of a third person . . .
> eliminates the intent for confidentiality on which the
> privilege rests.  The privilege is not, however, waived
> if a privileged communication is shared with a third
> person who has a common legal interest with respect to
> the subject matter of the communication.

**Hodges, Grant & Kaufman**, <u>supra</u> (citations and footnotes omitted).[12]

As we previously have noted, the controlling law in this area is "little more than a reinforcement of the Code of Professional

---

[9]    <u>McCormick on Evidence</u>, § 88 (Cleary 3d ed. 1984) (cases collected in note 3); Rev.Unif.R.Evid. 502(b) which extends the attorney-client privilege to communications made for the purpose of facilitating the rendition of legal services, cited in **Id.** at § 87, n.10.  <u>See</u>, <u>also</u>, Supreme Court Standard 503(a)(4) for similar language.  2 J. Weinstein & M. Berger, <u>Weinstein's Evidence</u>, § 503 (1991).

[10]    <u>McCormick on Evidence</u>, § 88 n.3.  <u>See</u>, <u>also</u>, 8 Wigmore, <u>Evidence</u>, § 2304 (McNaughton ed. 1961).

[11]    <u>See</u> <u>Restatement of The Law Governing Lawyers, Tentative Draft No. 2</u>, § 125, comments a-c, and Reporter's Notes (April 7, 1989) ("Tentative Draft").

[12]    <u>See</u>, <u>also</u>, <u>McCormick on Evidence</u>, § 91 at 219 and cases collected therein.

Responsibility, Ethical Considerations, and Disciplinary Rules, promulgated by the American Bar Association and adopted by the [local jurisdictions]." **Wilson P. Abraham Constr. Corp. v. Armco Steel Corp.**, 559 F.2d 250, 253 (5th Cir. 1977). The Model Rules of Professional Conduct, which replaced the earlier Code of Professional Responsibility, require an attorney to evaluate the relevant facts, circumstances, and parties to determine the appropriateness and propriety of assent to representation. "A lawyer should not accept representation in a matter unless it can be performed . . . without improper conflict of interest."[13] Of critical importance to a meaningful pre-representation interview is the availability of the attorney-client privilege from the initial salutation and greeting on. The existence of the privilege is an essential ingredient to a full and free exchange of information needed by the attorney for an intelligent assessment of the representation invitation.[14] The early declining of representation is in the mutual best interests of both the attorney and the prospective client. For the attorney there is the obvious savings of time and the avoidance of possible future conflicts. For the

---

[13] ABA Model Rules of Professional Conduct, Rule 1.16, comment ¶ 1.

[14] Dean Wigmore observes that "it would seem plain, by the reason of the privilege, that, since the would-be client cannot certainly predict the attorney's acceptance of the employment, the former must be protected in his preliminary statements when making the overtures, even if the overture is refused." 8 Wigmore, Evidence, § 2304 (McNaughton ed. 1961). See, also, Tentative Draft, supra, note 12.

11

prospective client the threshold declining of potentially problematic representation permits the timely seeking of other counsel, thus minimizing the possible losses and difficulties experienced if the attorney must later withdraw from an improvidently undertaken representation.

It necessarily follows that when more than one person seeks consultation with an attorney on a matter of common interest, the parties and the attorney may reasonably presume that the parties are seeking representation of a common or joint matter. In **United States v. Melvin**, 650 F.2d 641, 645 (5th Cir. Unit B 1981), we held that a "communication is protected by the attorney-client privilege . . . if it is intended to remain confidential and was made under such circumstances that it was reasonably expected and understood to be confidential." We therefore now hold that absent a contrary expression of intention by one of the parties, the existence of a matter of common interest must be presumed in the pre-representation phase as presented in the case at bar. To hold otherwise would present a conundrum whose only acceptable resolution would be that a lawyer may <u>never</u> meet with more than one potential client for fear that the attorney-client privilege would be destroyed as to all. We reach this conclusion based on the above cited authorities and analysis, and on the relevant attorney conduct rules imposed upon Burton by Texas law and federal rubrics.[15]

---

[15] Tex. Gov. Code Ann., Title 2, Subtitle G -- Appendix A. State Bar Rules, Art. 10, § 9, Rules 1.01-8.05 (Vernon 1992 Supp.). The Texas Rules are substantially similar to the Model Rules which

12

Applying this holding and rationale to the instant case we perforce must conclude that the district court was clearly erroneous in its factual findings and was in error as to its conclusions of law when it ruled that there was no attorney-client privilege extant at the time of the joint meeting on December 13, 1991 and that one of the jointly interviewed prospective clients could waive the privilege as to all participants. We hold that the attorney-client privilege extended to all matters from the scheduling of the joint conference until Burton informed Diane and Mike Sanders that he could not represent them because of a potential conflict. This holding is based on these facts: Prior to the December 13 meeting Burton knew only that Feazell and the Sanders couple sought to meet with him to discuss possible representation on some matter. The three arrived at Burton's office as a group, they met as a group, and Feazell recited a factual scenario which involved all of them. Acting on the reasonable presumption of a desire for representation in a matter of common interest, Burton acquitted his professional and ethical obligation to determine whether such representation was possible by conducting separate individual interviews. Neither by word nor deed did Feazell or either Sanders evidence any intention contrary to a common interest representation or to the reasonable

_____

we discuss herein. Fed.R.App.P. 46 requires that an attorney be admitted to practice before the highest court of a state and to be of good moral character for admission to the Fifth Circuit Bar. Local Rule 13.1 requires an attorney to be licensed to practice law by the Supreme Court of Texas for eligibility for admission to the Northern District bar.

expectation of confidentiality in either the group or separate meetings.

Feazell and Burton were reasonable in believing in the existence of common interests and possessed reasonable expectations of confidentiality sufficient to support the attorney-client privilege. Neither the fact that the joint representation ultimately proved impracticable nor the subsequent waiver by either or both Sanders can effect a retroactive recharacterization of the attorney-client relationship as it existed during the pre-representation meeting so as to defeat the protection the privilege affords Feazell.

The order of the district court is REVERSED.