APEX MUNICIPAL FUND,
et al., Plaintiffs,

v.

N–GROUP SECURITIES,
et al., Defendants.

Civ. A. No. H–92–0546.

United States District Court,
S.D. Texas,
Houston Division.

Oct. 28, 1993.

Carl A. Parker, Port Arthur, TX, for N–Group Securities Inc., Patrick NMI Graham, Michael Graham.

Iris Hefter Robinson, Charles Mark Stratton, Hirsch Glover Robinson & Sheiness, Robert David Daniel, Daniel & Lezar, Houston, TX, for Hutchinson Boyle Brooks & Fisher P.C., Ray Hutchinson, David Petruska.

Robert Hayden Burns, Butler & Binion, Houston, TX, for David Arnspiger.

David D. Peden, Jr., Greenberg Peden Siegmyer & Oshman, Houston, TX, for H.A. Lott, Inc.

L.K. Travis and Associates Inc., pro se.

Joseph M. Nixon, Houston, TX, for Pricor Inc.

Leslie Allen Palmer, Jr., Haley Davis Wren Bristow & Rasner, Waco, TX, for Angelina County Texas, Falls County Texas, Lasalle County Texas, San Saba County Texas, Swisher County Texas.

Barney L. Knight, Thomas M. Pollan, David Mendez, Michael A. Shaunessy, Bickerstaff Heath & Smiley, Austin, TX, for Pecos County Texas.

William Key Wilde, Tracie Jo Renfroe, Bracewell & Patterson, Houston, TX, for Keck Mahin & Cate.

Frank G. Jones, Fulbright & Jaworski, Houston, TX, Lawrence M. Berkowitz, W. Perry Brandt, Stinson Mag & Fizzell, Kansas City, MO, for George K. Baum & Co.

David D. Peden, Jr., Richie & Greenberg, P.C., Houston, TX, for Aetna Cas. and Sur. Co., H.A. Lott, Inc.

Bobby Nick Turner, FDIC, Houston, TX, for F.D.I.C.

Richard E. Gray, III, Austin, TX, for George Shipley, Shipley & Associates, Inc.

Michael P. Kessler, Weil Gotshal & Manges, Houston, TX, for DBLKM Inc.

James B. Galbraith, McLeod, Alexander, Powel & Appfel, P.C., Galveston, TX, for Southwest Econometrics, Inc.

Rodney Acker, Jenkens & Gilchrist, Dallas, TX, for Donaldson Lufkin & Jenrette Securities Corp.

Kathy D. Patrick, Gibbs & Ratliff, Houston, TX, for plaintiffs.

Alton J. Hall, Wickliff & Hall, Houston, TX, Cassandra G. Sasso, Denver, CO, Timothy P. Daly, Kutak Rock, Denver, CO, for Robert Bigelow.

Kenneth R. Wynne, Wynne & Maney, Houston, TX, for T. Rowe Price Tax–Free High Yield Fund, Inc.

## *MEMORANDUM AND ORDER*

LAKE, District Judge.

Pending before the court is Plaintiffs' Motion to Compel Production of Documents by Defendant Keck, Mahin & Cate (KMC). (Docket Entry No. 514) Plaintiffs are an individual and several bond funds that bought revenue bonds issued by jail financing corporations to finance the construction of detention facilities in six rural Texas counties. Drexel, Burnham & Lambert, Inc. (DBL) was the underwriter on the bonds, and KMC acted as legal counsel for DBL. Plaintiffs allege that KMC is liable under state and federal securities laws and pendent state law causes of action, including fraud, because KMC made misrepresentations and material omissions in official statements, correspondence with plaintiffs, and telephone conference calls regarding, among other things, potential occupancy, standards, and financing of the jail facilities. (Plaintiffs' Second Amended Complaint at 12, 61; Docket Entry No. 312) Plaintiffs also allege that KMC was simultaneously serving as counsel to N–Group Securities, Inc., the financial advisor, developer, and subcontractor for the jail facilities, and that KMC worked on a contingent fee basis for DBL under which KMC would only be paid if DBL was successful in selling the bonds. (*Id.* at ¶¶ 11N, 12, 20, 61.)

In their motion to compel plaintiffs argue that because KMC collected information for the purpose of ultimately publishing it to the general public in offering statements, the underlying documents reflecting that information are not protected by the attorney-client privilege. In the alternative, plaintiffs argue that even if the documents listed in KMC's First Amended Privilege Log were privileged, the privilege was waived when KMC witnesses selectively disclosed information contained in the documents during their depositions. Finally, plaintiffs argue in their "Submission of Supplemental Evidence" (Docket Entry No. 604) that DBL never intended the documents listed in KMC's privilege log to be privileged. Plaintiffs support this argument with an affidavit by Kenneth E. Bentsen, Jr., a former DBL employee. Bentsen states that when DBL declared bankruptcy he was told by DBL to close the Houston office, but DBL gave him no instructions about files maintained in the Houston office, and in 1992 he produced to plaintiffs a number of DBL documents similar to (and in several cases the same as) those listed in KMC's First Amended Privilege Log. Plaintiffs argue that even after DBL and KMC discovered that Bentsen had produced these documents they took no steps to rectify the disclosure. (Docket Entry No. 604 at 1–2)

KMC responds that the attorney-client privilege protects the underlying documents used to prepare the public offering statements because the documents reflect confidential communications among KMC and its agents and KMC's client, DBL, that were prepared to facilitate the rendition of legal services. KMC also argues that only a portion of the documents that plaintiffs seek relate to the public offerings and that plaintiffs also seek documents relating to due diligence and general legal advice given by KMC to DBL. KMC argues that the attorney-client privilege was scrupulously maintained at depositions and that plaintiffs' allegations of selective disclosure fail to show otherwise. Finally, KMC argues that Bentsen's production of documents did not waive DBL's attorney-client privilege because when Bentsen produced the documents he was no longer a DBL employee, because he produced the documents without DBL's knowledge, and because DBL never ratified Bentsen's actions.

## I. *The Attorney–Client Privilege*

"[T]he attorney-client privilege protects communications made in confidence by a client to his lawyer for the purpose of

obtaining legal advice.[1] The privilege also protects communications from the lawyer to the client, at least if they would tend to disclose the client's confidential communications." *Hodges, Grant & Kaufmann v. United States Government,* 768 F.2d 719, 720–21 (5th Cir.1985) (citations omitted). "Because the privilege protects only confidential communications, the presence of a third person while such communications are made or the disclosure of an otherwise privileged communication to a third person eliminates the intent for confidentiality on which the privilege rests. The privilege is not, however, waived if a privileged communication is shared with a third person who has a common legal interest with respect to the subject matter of the communication." *Id.* at 721 (citations omitted).

"The burden to establish the applicability of the attorney-client privilege rests on the party who invokes it." *Hodges,* 768 F.2d at 721. "The privilege must be specifically asserted with respect to particular documents." *United States v. El Paso Co.,* 682 F.2d 530, 539 (5th Cir.1982), *cert. denied,* 466 U.S. 944, 104 S.Ct. 1927, 80 L.Ed.2d 473 (1984). Applicability of the privilege "is a question of fact, to be determined in the light of the purpose of the privilege and guided by judicial precedents." *Hodges,* 768 F.2d at 721. The proponent of the privilege "must establish not only that an attorney-client relationship existed, but also that the particular communications at issue are privileged and that the privilege was not waived." *United States v. Jones,* 696 F.2d 1069, 1072 (4th Cir.1982).

**II.** *Application of the Attorney–Client Privilege to Communications Used to Facilitate the Preparation of Public Offering Statements*

■ The Fifth Circuit has not expressly addressed the applicability of the attorney-client privilege to underlying communications relied on in the creation of public offering statements. However, the Fifth Circuit has considered and followed the general rule that when a client intends to disclose information to third parties, the communication of that information to his or her attorney does not make it privileged. *See United States v. Pipkins,* 528 F.2d 559, 563 (5th Cir.), *cert. denied,* 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1191 (1976); *United States v. El Paso Co.,* 682 F.2d at 538.

In *Pipkins* the Fifth Circuit held that because the defendant failed to establish that handwriting samples he provided to a handwriting expert hired by his attorney were intended to be confidential, the handwriting samples were not protected by the attorney-client privilege. Noting that the defendant had already given handwriting samples to the government, the court concluded that "[a]ny hope of confidentiality was thus an impossibility from the outset." 528 F.2d at 563. In holding the privilege inapplicable the court stressed that "[i]t is vital to a claim of privilege that the communication[s] have been made and maintained in confidence. Thus courts have refused to apply the privilege to information that the client intends his attorney to impart to others, or to communications made in the presence of third parties." *Id.* In *El Paso* the Fifth Circuit held that El Paso Co. waived the attorney-client privilege with respect to information used to prepare a tax pool analysis because it revealed the analysis and underlying memoranda to independent auditors and because it did not prove that the documents were prepared by attorneys as opposed to accountants to whom the privilege did not apply. 682 F.2d at 540–41.

In both *Pipkins* and *El Paso* the Fifth Circuit was able to conclude that the communications at issue were not intended to be privileged because the communications themselves had been disclosed to third parties. Determining KMC's intentions is more com-

1. The privilege also protects "communications made for the purpose of facilitating the rendition of legal services" between a potential client and a lawyer. *In re Auclair,* 961 F.2d 65, 69 n. 9 (5th Cir.1992) (citing *McCormick on Evidence,* § 87, n. 10 (Cleary 3d ed. 1984)). *See also In re Bevill, Bresler & Schulman Asset Management Corp.,* 805 F.2d 120, 124 n. 1 (3d Cir.1986) ("The attorney-client privilege protects conversations between prospective clients and counsel as well as communications with retained counsel.") The court thus finds no merit in plaintiffs' argument that Document 45 is not privileged because it was prepared 12 days before KMC began representing DBL.

plicated, however, because only the final published statements were revealed to third parties. For purposes of this argument plaintiffs do not contend that underlying communications between DBL and KMC or internal KMC communications were disclosed to third parties.

Courts in other circuits are split on whether the communications in issue are privileged. To support their argument that the documents furnished by DBL to KMC are not privileged plaintiffs rely on *In re Grand Jury Proceedings,* 727 F.2d 1352, 1356 (4th Cir.1984) (holding that the attorney-client privilege did not protect information communicated to attorney for purpose of preparing a prospectus); *United States v. (Under Seal),* 748 F.2d 871, 875 (4th Cir.1984), *vacated as moot,* 757 F.2d 600 (1985) (holding that the privilege did not apply to documents used to prepare a proposed tax ruling); *United States v. Lawless,* 709 F.2d 485, 488 (7th Cir.1983) (holding that the privilege did not apply to documents relied on in preparation of an estate tax return); and *United States v. Cote,* 456 F.2d 142, 145 (8th Cir.1972) (holding that by filing a tax return the taxpayer waived the attorney-client privilege with respect to underlying details relied upon in preparing the tax return). In these cases the courts reasoned that the attorney-client privilege never attached to the documents because the client understood or intended that the substance of the document be revealed to others, for example, "in the form of an offering brochure or income tax returns," *In re Grand Jury Proceedings,* 727 F.2d at 1356, and that even if the privilege did apply to the underlying "details," [2] it was waived by publication of the final documents. *See Cote,* 456 F.2d at 144–45. *See also Under Seal,* 748 F.2d at 875–76 (noting that the initial request to research the possibility of filing

public papers is privileged, but the privilege can be waived by the client's authorization for the attorney to prepare a public filing).

In support of the contrary position that underlying documents are privileged KMC relies on *United States v. Schlegel,* 313 F.Supp. 177 (D.Neb.1970), and *Schenet v. Anderson,* 678 F.Supp. 1280 (E.D.Mich.1988). In *Schlegel* the defendant asserted the attorney-client privilege for all communications with his attorney regarding the preparation of a tax return that was later filed. The government argued that no privilege existed as to the underlying communications because the defendant had provided the information to his attorney with knowledge that the final document would eventually be disclosed to third parties, including the government. The court rejected the government's argument and held that the communications were privileged, reasoning that "the client intends only as much of the information will be conveyed to the [third party] as the attorney concludes should be, and ultimately is, sent to the [third party].... The fact that the client has relinquished to his attorney the making of the decision of what needs to be included in the tax return should not enlarge his intent or decrease the scope of the privilege." *Id.* at 179. In *Schenet* the court followed *Schlegel* and held that the attorney-client privilege protected preliminary drafts of stock purchase offers and tender offers and rejected the plaintiff's contention that such documents were not privileged because they were used in preparing a document intended for public disclosure. 678 F.Supp. at 1284. The court held that the privilege had been waived only with respect to portions of the preliminary drafts that were ultimately revealed to the public.

---

**2.** Courts utilizing the approach urged by plaintiffs interpret *Cote*'s waiver very broadly to encompass all of the information communicated to the attorney. *See, e.g., Under Seal,* 748 F.2d at 875 n. 7 ("The details underlying the published data are the communications relating the data, the document, if any, to be published containing the data, all preliminary drafts of the document, and any attorney's notes necessary to the preparation of the document. Copies of other documents, the contents of which were necessary to the preparation of the published document, will

also lose the privilege.") It is not apparent, however, that the court in *Cote* intended such a broad interpretation of underlying details. *See Cote,* 456 F.2d at 145 n. 4 (noting that "[t]oo broad an application of the rule of waiver requiring unlimited disclosure by reason of filing an income tax return might tend to destroy the salutary purposes of the privilege...." and citing an example "which specifically withholds disclosure of memoranda and worksheets to the extent they contain confidential data not already published on the tax return").

The court is persuaded that the *Schlegel* approach best reflects the realistic expectations of parties who seek legal advice in the preparation of public offering statements. Under this rule preliminary drafts of documents and communications made between attorney and client during the drafting process are privileged. *E.g., Schenet*, 678 F.Supp. at 1284. Only those parts of attorney-client documents that ultimately appear in published documents are outside of the privilege.[3] As aptly explained by the Tenth Circuit in an analogous context, "[t]he situation is like that where a client gives general information to his lawyer so that the lawyer may prepare a complaint in any ordinary civil action. The fact that some of the information is thus disclosed does not waive the privilege." *Natta v. Hogan*, 392 F.2d 686, 692 (10th Cir. 1968) (holding that the attorney-client privilege protects underlying documents used in patent proceedings). *See Note, Disclosure Under the Securities Laws: Implications for the Attorney–Client Privilege*, 90 COL. L.REV. 456, 474 (1990)· ("Hiring an attorney to prepare a disclosure document is closely analogous to hiring an attorney for the purpose of representation in litigation. The possibility that the attorney might use particular client communications to prepare pleadings and represent the client in open court does not alone show the lack of intended confidentiality with respect to communications that are made to prepare the attorney for litigation."). *See also Buford*, 133 F.R.D. at 492 ("The ultimate conclusion [of the contrary rule] would be that the mere filing of a complaint or an answer abrogates the privilege as to all communications between an attorney and his client which occurred prior to the filing of such a document. The result

of such a standard would be the near total destruction of the attorney-client privilege.").

The *Schlegel* rule also fosters more open communication between attorneys and clients than does the rule urged by plaintiffs. "[T]he privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn Co. v. United States*, 449 U.S. 383, 390, 101 S.Ct. 677, 683, 66 L.Ed.2d 584 (1981). If communications made to an attorney to assist the attorney in preparing public offering statements were not privileged, clients might be tempted to withhold information from the attorney. *See Note*, 90 COL.L.REV. at 472. Accordingly, the court concludes that documents reflecting information conveyed by DBL to KMC to prepare public offering statements are protected by the attorney-client privilege, except to the extent that the information in them actually appears in public documents. *See Schenet*, 678 F.Supp. at 1284.[4]

### III. Waiver of Attorney–Client Privilege at Depositions and through Offensive Use of Privileged Information

#### A. Selective Disclosure

Plaintiffs argue that KMC waived the attorney-client privilege with respect to all communications regarding the public offering statements through selective disclosures by KMC attorneys during their depositions. As examples of these disclosures plaintiffs point to deposition testimony of KMC partners Mark White and Kai Nebel, to which KMC did not object, about the lack of competitive bidding on the jail construction projects, DBL's $80,000 loan to N–Group, fees to be paid to N–Group by defendant, H.A. Lott, Inc., in connection with the jail construction

---

**3.** Other decisions that follow this rule include *United States v. Upjohn Co.*, 600 F.2d 1223, 1227 n. 12 (6th Cir.1979), *rev'd on other grounds*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981); *Natta v. Hogan*, 392 F.2d 686, 692 (10th Cir. 1968); *United States v. Willis*, 565 F.Supp. 1186, 1193 (S.D.Iowa 1983); *SEC v. Texas International Airlines, Inc.*, 29 F.R.Serv.2d 408, 410 (D.D.C. 1979); and *United States v. Schmidt*, 360 F.Supp. 339, 350 n. 35 (M.D.Penn.1973). *See also Buford, et al. v. Holladay, et al.*, 133 F.R.D. 487, 492 (S.D.Miss.1990) (holding that official publication of documents does not waive the privilege "as to

all communications that were a necessary part of creating that public document").

**4.** KMC argues alternatively that some of the documents in the privilege log do not relate to the preparation of public offering statements but reflect attorney-client communications relating to due diligence and general legal advice. Because of the court's conclusion that the privilege is not automatically waived with respect to documents relating to the public offering statements, the court need not address this argument.

projects, due diligence in KMC's investigation of N–Group, and the standards to which the jails would be built.

In response to a question during his deposition whether competitive bidding was required on the jail projects White answered: "Let me say that I asked the question of the lawyers in my law firm if this was a permissible way in which to proceed and I was advised that it was." (Plaintiffs' Motion to Compel, Exhibit C, Vol. II at 604) Nebel testified that Brent Bailey, another KMC attorney, undertook research concerning the competitive bidding requirement (Exhibit D, Vol. I at 118) and about instructions he gave Bailey while Bailey was researching the components of the official statement. (*Id.* at 121.)

Nebel testified that when he learned that DBL was planning to make a loan to N–Group he discussed this matter with Bailey.

> I told him that I didn't think it would be proper for—for a loan to be made unless there was adequate consideration for the loan in terms of the purpose of the—purpose of issuing it, and he advised me that—that in this particular case, the—they wouldn't have the underwriting job unless they did agree to make the loan.
>
> I said, 'Well you know, you have to do research on that ... I wouldn't want that to happen without an opinion as to the fact that—that it is appropriate.'
>
> And he did prepare an opinion in respect to that particular matter....

(Plaintiffs' Supplemental Submission of Arguments, Exhibit A, Vol. I at 16–17) In response to a question whether he knew that N–Group was receiving separate fees from defendant H.A. Lott, Inc. in connection with the jail construction projects Nebel testified that he "made inquiry of Brent [Bailey] to the effect—that there was this fee prior to the time of the official statement." (Plaintiffs' Supplemental Submission, Exhibit D,

Vol. I at 44–45) Although he did not know the amount of the fees, as a result of these discussions Nebel determined that the fees were not material and that he would make no additional inquiry as to their amount. (*Id.* at 237–238.)

Nebel also testified that he questioned Bailey regarding the term "maximum security" in the preliminary official statement and that Bailey stated "what that means is that it is a facility which is—which is built with materials, which, although this is a detention center, has—distinguishes it...." (Plaintiffs' Motion to Compel, Exhibit D, Vol. I at 166)

KMC has submitted an affidavit of Karen M. Cullen, senior associate counsel with DBL Liquidating Trust (the successor to DBL), prepared in July of 1993 after these depositions were taken, in which Cullen instructs KMC on behalf of DBL to invoke the attorney-client privilege "as to communications by and between Keck, Mahin & Cate." (Exhibit to KMC's Response, Affidavit of Karen M. Cullen at ¶ 3) The affidavit recites Cullen's understanding that all communications undertaken in the preparation of the public offering statements were protected by the privilege. (Affidavit of Karen M. Cullen at ¶ 2) KMC argues that under these circumstances KMC could not have waived the privilege regardless of what its attorneys said during their depositions because the privilege belonged to the client and the client has not waived it.

 Internal communications between KMC attorneys made to facilitate the rendition of legal services to DBL are protected from disclosure by the attorney-client privilege unless the privilege has been waived. *See* Supreme Court Standard 503 (The attorney-client privilege extends to "confidential communications made for purpose of facilitating the rendition of professional legal services to the client ... between lawyers representing the client.").[5] *See also* Texas Rule of Crim.Evidence 503(b). In general the attor-

---

**5.** Although Supreme Court Standard 503 was not included in the Federal Rules of Evidence, federal courts have uniformly held that it nevertheless reflects the federal common law attorney-client privilege. *See United States v. Spector,* 793 F.2d 932, 938 (8th Cir.1986), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 876, 93 L.Ed.2d 830 (1987);

(*Under Seal*), 748 F.2d at 874 n. 5; *United States v. Moscony,* 927 F.2d 742, 751 (3d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2812, 115 L.Ed.2d 984 (1991). *See also* 2 J. Weinstein, *Evidence,* ¶ 503[02] (1975). Accordingly, the rule provides guidance to the court.

ney-client privilege belongs to the client, and an attorney cannot unilaterally waive it. *See, e.g., United States v. Juarez,* 573 F.2d 267, 276 (5th Cir.), *cert. denied,* 439 U.S. 915, 99 S.Ct. 289, 58 L.Ed.2d 262 (1978); *Haines v. Liggett Group, Inc.,* 975 F.2d 81, 90 (3d Cir.1992). However, an attorney can waive the privilege when the attorney has been accused of wrongdoing. *See, e.g., In re National Mortgage Equity Corp. Mortgage Pool Sec. Litigation,* 120 F.R.D. 687, 692 (C.D.Cal. 1988); *First Federal Sav. & Loan Assoc. of Pittsburgh v. Oppenheim, Appel, Dixon & Co.,* 110 F.R.D. 557, 567 (S.D.N.Y.1986). When a client accuses an attorney of wrongdoing, the client himself waives the privilege by challenging the attorney's actions. Although this reasoning does not apply when an attorney is sued by a third party, courts that have confronted this situation have concluded that an attorney can waive the privilege to defend himself against third-party accusations even though the client does not agree to waive the privilege. *See, e.g., In re National Mortgage,* 120 F.R.D. at 690; *First Federal,* 110 F.R.D. at 559. Thus, despite DBL Liquidating Trust's alleged intention to the contrary, KMC could waive the privilege in this action against KMC.

■ After carefully considering the deposition testimony of the KMC attorneys described above, the court concludes that KMC attorneys selectively disclosed the substance of privileged communications about the lack of competitive bidding on the jail construction projects, N–Group's fees from H.A. Lott, Inc., and the DBL loan to N–Group, but did not disclose privileged communications on the other topics urged by plaintiffs. *See, e.g., Weil v. Investment/Indicators, Research & Management, Inc.,* 647 F.2d 18, 23–25 (9th Cir.1981) (holding that disclosure of privileged information at deposition waived the attorney-client privilege); *Perrignon v. Bergen Brunswig Corp.,* 77 F.R.D. 455, 459 (N.D.Cal.1978) (holding that party waived attorney-client privilege through disclosure of privileged conversations at depositions); *Panter v. Marshall Field & Co.,* 80 F.R.D. 718, 722 (N.D.Ill.1978) (holding that defendants waived the attorney-client privilege by discussing their reliance on advice of counsel during depositions and answers to interroga-

tories). The other alleged examples of waiver do not constitute selective disclosures either because they revealed only the general nature of attorney conversations, but not the substance of the conversations, or because the information discussed by the attorneys was not privileged. Although some of this testimony related in general terms to private conversations between KMC attorneys about the preparation of the public offering statements and due diligence on behalf of KMC's client, DBL, this testimony did not disclose any direct client communications by DBL to KMC or the substance of internal KMC communications.

The court is not persuaded that the selective disclosure about the lack of competitive bidding, the N–Group fees, and the DBL loan to N–Group waived the attorney-client privilege with respect to the entire subject matter of KMC's representation, i.e., the bond transaction. *See, e.g., In re National Mortgage,* 120 F.R.D. at 692 (holding that where the privilege was waived by using privileged information in self-defense, fairness dictates that the waiver should be narrowly construed and only applies to communications on the same topic, not to all attorney-client communications); *Weil,* 647 F.2d at 25 (holding that when the privilege was waived through disclosure the waiver only applied to the specific topic of the representation actually disclosed).

### B. *Offensive Use of the Privilege*

■ Intertwined with plaintiffs' selective disclosure argument is their argument that fairness demands waiver of the privilege because KMC is using the privilege as a "sword" and not as a "shield." According to plaintiffs KMC relies on the contents of confidential communications to prove that it lacked the culpable state of mind necessary to commit the fraud alleged against it. Neither party addresses whether Texas or federal law governs this issue. The question is important because Texas law imposes a more rigorous standard to determine whether a waiver has occurred through offensive use of privileged information. *See Republic Insurance Co. v. Davis,* 856 S.W.2d 158, 163 (Tex. 1993). Under Texas law offensive use of

privileged information does not result in waiver unless the party to whom waiver would apply is seeking affirmative relief. *Id.* at 163–64. The court will apply federal law, however, to determine the scope of the privilege in this action, which is based on federal and state law claims. *See, e.g., Cary v. Soileau,* 125 F.R.D. 432, 433–34 (W.D.La.1989) (holding that federal law, not state law, governs the privilege determination where case involves both state and federal claims). *See also* C. Wright & K. Graham, 23 *Federal Practice and Procedure* § 5434 at 862–63 (noting that courts have taken the position that the federal rules should be applied when there are pendant state claims but favoring an *ad hoc* balancing test).

The Fifth Circuit has stated that "[t]he attorney-client privilege 'was intended as a shield, not a sword. When confidential communications are made a material issue in a judicial proceeding, fairness demands treating the defense as a waiver of the privilege.'" *Conkling v. Turner,* 883 F.2d 431, 435 (5th Cir.1989). Accordingly, "the attorney-client privilege is waived when a litigant 'places information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would be manifestly unfair to the opposing party.'" *Id.* In *Conkling* the Fifth Circuit held that where defendants raised a defense based on statute of limitations and plaintiff responded with a tolling argument based on his lack of knowledge, plaintiff had placed his knowledge at issue and defendants were entitled to depose plaintiff's attorney about the timing and extent of plaintiff's knowledge about his claim. *Id.* at 434–35.

Plaintiffs' second amended complaint alleges that KMC knew or should have known of the material misstatements and omissions in the public offering statements and other communications from KMC that plaintiffs relied upon, and that KMC has therefore violated federal and state securities laws and committed fraud. Although for the most

part KMC has asserted defenses unrelated to privileged information, KMC has also raised its reliance on its interpretation of the law as a defense to certain claims. In its motion for summary judgment KMC argues that it cannot be held liable to plaintiffs because

> in the view of all counsel working on the transaction after reviewing the agreements competitive bidding of the construction agreements was not required.... *Nondisclosures by KMC, if any, were thus prompted by its opinion or interpretation of the law, which is not actionable fraud. The same is true for Ruiz.*

(KMC's Memorandum in Support of its Motion for Summary Judgment at 16–17, Docket Entry No. 587) (emphasis added) This argument is not merely a denial of plaintiffs' allegations; it injects into the case KMC's understanding and interpretation of the law to deny any fraudulent intent on the competitive bidding and *Ruiz* issues.[6] Such a defense, injected by KMC, is analogous to a reliance-on-advice-of-counsel defense. Although here KMC is relying on its own legal analysis, that distinction does not preclude a waiver.

Because KMC has inserted its understanding of the law as a basis for the reasonableness of its actions relating to the competitive bidding and *Ruiz* issues, the attorney-client privilege has been waived with respect to those topics. *See, e.g., In re Taxable Municipal Bond Securities Litigation,* 1993 WL 323069 (E.D.La.1993) (holding that underwriters who stated that they looked to counsel for due diligence of bond issuance had waived the privilege "with respect to those documents relating to issues [on] which the reliance upon advice of counsel defense has been asserted"); *Chevron Corp. v. Pennzoil Co.,* 974 F.2d 1156, 1162–63 (9th Cir.1992) (holding that in case involving Pennzoil's alleged misleading stock purchaser's disclosure statement, Pennzoil waived the attorney-client privilege by "claiming that its tax position is reasonable because it was based on

---

**6.** The *"Ruiz* issue" relates to *Ruiz v. Estelle,* a class action on behalf of inmates housed in the Texas Department of Corrections. Consent decrees in that case impose space requirements on the housing of inmates. *See, e.g., Ruiz,* 679 F.2d

1115, 1148 (5th Cir.), *amended in part, vacated in part, reh'g denied in part,* 688 F.2d 266 (1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983).

the advice of counsel...."); *United States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991) (holding that privilege was waived when defendant argued that his actions were legal because this argument "put his knowledge of the law and the basis for his understanding of what the law required in issue"); *In re Bairnco Corp. Securities Litigation,* 148 F.R.D. 91, 101 (S.D.N.Y.1993) ("To permit [defendant] to offer the fact of counsel's conclusions where such conclusions serve [defendant's] purposes without permitting plaintiffs access to all the communications between counsel and [defendant] would prejudice plaintiffs in the prosecution of their action.").

### IV. Waiver of Attorney–Client Privilege by Bentsen's Production of Privileged Documents

Plaintiffs argue that KMC and DBL waived the attorney-client privilege with respect to all communications regarding the bond transaction because of the disclosure of certain documents by Kenneth E. Bentsen, Jr., a former employee of DBL. In his affidavit Bentsen states that when DBL declared bankruptcy in early 1990 he was instructed to close the Houston office, but he "received no direction about what to do with the files from the office." (Bentsen Affidavit at ¶ 3, Exhibit A to Plaintiffs' Submission of Supplemental Evidence, Docket Entry No. 604) According to Bentsen, DBL "simply left those and other [DBL] files in [his] custody ... and [he] received no instructions about what to do with the documents nor did anyone from [DBL] or its counsel contact [him] to request that the documents be returned. After [DBL] abandoned these documents, they remained in [his] custody for over two years." (Bentsen Affidavit at ¶ 3) In the summer of 1992 Bentsen disclosed to plaintiffs documents relating to the bond transactions at issue in this case in response to a subpoena. (Bentsen Affidavit at ¶ 3) Four documents that appear on KMC's First Amended Privilege Log were among the documents disclosed by Bentsen. (KMC's Response to Plaintiffs' Supplemental Submission, Docket Entry No. 614 at 11)

KMC argues that this disclosure by Bentsen was not authorized or ratified and cannot form the basis of a waiver of the attorney-client privilege. To support its argument KMC offers another affidavit of Karen Cullen of DBL. (September 22, 1993, Affidavit of Karen Cullen, Docket Entry No. 614, Exhibit D) According to Cullen DBL did not authorize Bentsen's disclosure of these documents and neither DBL nor DBL Liquidating Trust ratified or consented to the disclosure. (Cullen Affidavit at ¶¶ 2, 3)

As the party asserting the attorney-client privilege KMC bears the burden of demonstrating that the privilege applies. Furthermore, because "the privilege stands in derogation of the public's right to every man's evidence, and as an obstacle to the investigation of the truth, ... [i]t ought to be strictly confined within the narrowest possible limits consistent with logic of its principle." *Pipkins,* 528 F.2d at 563 (citations omitted). Bentsen's disclosure of the privileged information is best characterized as an "inadvertent disclosure," that is, "a situation in which the client does not intend that the confidentiality of the communication be breached, but third parties nevertheless gain knowledge of its contents." E. Epstein & M. Martin, *The Attorney–Client Privilege & the Work–Product Doctrine,* 2d ed. at 63 (ABA Sec. of Litigation) (1988). Under the traditional approach an inadvertent disclosure automatically waived the privilege. *Id.* at 63–64. 8 Wigmore, *Evidence* § 2325 at 633 (McNaughton rev. 1961) ("All *involuntary* disclosures, in particular, through the loss or theft of documents from the attorney's possession, are not protected by the privilege, on the principle that, since the law has granted secrecy so far as its own process goes, it leaves to the client and attorney to take the measures of caution sufficient to prevent being overheard by third persons. The risk of insufficient precautions is on the client."). *See also Alldread v. City of Grenada,* 988 F.2d 1425, 1434 (5th Cir.1993) (noting that some courts place the risk of inadvertent disclosure on the holder of the privilege). However, the Fifth Circuit favors the modern trend, "declin[ing] to apply this 'strict responsibility' rule of waiver and opt[ing] instead for an approach which takes into

account the facts surrounding a particular disclosure." *Alldread,* 988 F.2d at 1434.

■ In determining whether an inadvertent disclosure waives the privilege, the court must "consider the circumstances surrounding a disclosure on a case-by-case basis ..." *Alldread,* 988 F.2d at 1435. A case-by-case "analysis serves the purpose of the attorney-client privilege, the protection of the communications which the client fully intended would remain confidential, yet at the same time will not relieve those claiming the privilege of the consequences of their carelessness if the circumstances surrounding the disclosure do not clearly demonstrate that continued protection is warranted." *Id.* Factors to be considered in this analysis include:

(1) the reasonableness of precautions taken to prevent disclosure;

(2) the amount of time taken to remedy the error;

(3) the scope of discovery;

(4) the extent of the disclosure; and

(5) the overriding issue of fairness.

*Id.* at 1433, *citing Hartford Fire Insurance Co. v. Garvey,* 109 F.R.D. 323 (N.D.Cal.1985). *See also Granada Corp. v. First Court of Appeals,* 844 S.W.2d 223, 227 (Tex.1992) (examining factors such as (1) whether the party seeking to preserve privilege took steps to do so; and (2) when that party sought to protect the documents disclosed, in order to determine whether privilege preserved); *The Attorney–Client Privilege* at 65 ("The courts have increasingly looked at the client's 'culpability,' both in allowing the breach of confidentiality and in continuing to assert the privilege after the breach.")

■ Applying these factors to the present case the court concludes that KMC has failed to demonstrate that the privilege should be preserved. KMC has not established that either DBL or KMC took any precautions to prevent the disclosure of the documents by Bentsen. Although Cullen stated in her September 22, 1993, affidavit that the privilege always applied to these documents and continues to apply to them, KMC has not refuted Bentsen's statement that neither DBL (or the DBL Liquidating Trust) nor KMC attempted to retrieve the documents when DBL's Houston office closed, and that the documents were effectively "abandoned." Moreover, even were the court to assume that KMC and DBL did not have an opportunity to take precautions to protect the privilege once disclosure became imminent because Bentsen did not contact them before producing the documents, the privilege would still be waived because of the inaction of DBL, DBL Liquidating Trust, and KMC once the disclosure was made known to them. KMC does not refute plaintiffs' argument that KMC learned of the disclosure over a year ago and that KMC, DBL, and DBL Liquidating Trust failed to take any action at that time to attempt to remedy Bentsen's alleged impropriety in disclosing, without DBL's authority, documents that belonged to DBL. Simply put, a one-year delay in taking any action to attempt to preserve the privilege exemplifies carelessness. *See, e.g., Granada,* 844 S.W.2d at 227 (noting as evidence of Granada's failure to preserve the privilege the fact that it did not seek to remedy the error until 11 months after disclosure).

KMC has not argued and the court does not find that any of the other factors discussed above support preservation of the privilege. KMC's only argument for nonwaiver of the privilege is that since only DBL, the client, can waive the privilege, Bentsen did not have authority to waive the privilege on DBL's behalf. To support this argument KMC cites several cases that stand for the general principle that the attorney-client privilege belongs to the client and may not be unilaterally waived or assumed by the attorney. The court has no quarrel with this proposition, but it misses the point; it was DBL's overall carelessness that waived the privilege, not merely Bentsen's unauthorized disclosure. DBL took no action to secure and protect privileged documents in its Houston office when that office was closed for at least two years. Even though KMC learned of Bentsen's disclosure of the privileged information to third parties a year ago, neither KMC, DBL, nor the DBL Liquidating Trust took any action to attempt to preserve the privilege.

Under these circumstances KMC, DBL, and DBL Liquidating Trust will not be relieved "of the consequences of their carelessness." *Alldread,* 988 F.2d at 1434. The court finds that DBL waived the attorney-client privilege with respect to all privileged documents disclosed by Bentsen. While the inadvertent disclosure of the four privileged documents does not waive the privilege with respect to the entire subject matter of the representation, i.e., the bond transaction, it does waive the privilege with respect to the topics discussed in the privileged documents produced by Bentsen. *See, e.g., In re Sealed Case,* 676 F.2d 793, 809 n. 54 (D.C.Cir.1982) (citation omitted) ("Courts apparently retain discretion not to impose full waiver as to all communications on the same subject matter where the client has merely disclosed a communication to a third party, as opposed to making some use of it."). *See also Weil,* 647 F.2d at 25 (9th Cir.1981) (holding that the privilege was waived by disclosure to opposing counsel only as to the matter actually disclosed and not as to the entire subject matter of the representation when "disclosure occurred early in proceedings and was made to opposing counsel rather than to the court"). This approach is warranted by the circumstances underlying the disclosure and fairness to the defendants.

### V. *Conclusion*

Plaintiffs' Motion to Compel Documents in KMC's First Amended Privilege Log (Docket Entry No. 514) is **DENIED** in part based upon plaintiffs' argument addressed in Part II of this Memorandum and Order, **GRANTED** in part based upon plaintiffs' arguments addressed in Part III, and **GRANTED** in part based upon plaintiffs' argument addressed in Part IV. The parties are **ORDERED** to file the following items within ten days of the entry of this Memorandum and Order:

(1) A list of all documents or parts of documents in the First Amended Privilege Log that are not privileged because they contain information that actually appears in public documents.

(2) A list of all documents or parts of documents in the First Amended Privilege Log that deal with the following topics for which the attorney-client privilege was waived:

(a) the lack of competitive bidding on the jail construction projects,

(b) N–Group fees from H.A. Lott, Inc.,

(c) the DBL loan to N–Group, and

(d) the *Ruiz* issue.

(3) A list of all documents or parts of documents in the First Amended Privilege Log that were waived by Bentsen's document production. The list should identify the specific topics addressed in the privileged documents produced by Bentsen and should identify all documents or parts of documents in the First Amended Privilege Log that are waived because of the disclosure of privileged information on the same topics.

If the parties are unable to agree on any of these items, they should notify the court and the court will schedule a conference to explore alternative means of identifying these documents.