Francisca **SANDOVAL**, Ines **Hernandez**, Miriam **Pachecho**, Eva **Reyes**, Arminda **Gomez**, Nidia **Guerrero**, Lucila **Marquez**, Maria **Perez**, Azucena **Garcia**, Estela **Laureano**, and Marlene **Giron**, Plaintiffs,

v.

**AMERICAN BUILDING MAINTENANCE INDUSTRIES, INC.**, a/k/a ABM Industries Incorporated, d/b/a ABM Janitorial Services and American Building Maintenance Co. of Kentucky, Defendants.

**No. 06 CV 1772 (RHK/JSM).**

United States District Court,
D. Minnesota.

Oct. 23, 2007.

Brendan D. Cummins, Justin D. Cummins, Kelly A. Jeanetta, M. William O'Brien, Francis P. Rojas, Miller O'Brien Cummins, PLLP, Minneapolis, MN, for Plaintiffs.

Robert R. Reinhart, Joel D. O'Malley, Dorsey & Whitney LLP, Holly M. Robbins, Kathryn Mrkonich Wilson, Littler Mendelson, PC, Minneapolis, MN, for Defendants.

## ORDER

JANIE S. MAYERON, United States Magistrate Judge.

The above matter came on before the undersigned upon plaintiffs' Motion to Compel and for Sanctions [Docket No. 84] and defendants' Motion to Compel [Docket No. 102]. Justin Cummins, Esq. appeared on behalf of plaintiffs; Jacqueline Mrachek, Esq. and Nancy Brasel, Esq. appeared on behalf of defendants.

The Court, upon all of the files, records, proceedings herein, and for the reasons stated forth on the record at the hearing and in the Memorandum below, now makes and enters the following Order.

IT IS HEREBY ORDERED that:

1. Plaintiffs' Motion to Compel and for Sanctions [Docket No. 84] is **GRANTED** in part and **DENIED** in part, as follows:

 a. Plaintiffs' Motion to Compel as it relates to plaintiffs' request for unredacted financial documents provided to plaintiffs in a redacted format, responsive to Document Request No. 21, is **DENIED** as set forth in the Memorandum below

 b. Plaintiffs' Motion for Sanctions is **DENIED.**

2. Defendants' Motion to Compel [Docket No. 102] is **GRANTED** in part, **DENIED** as set forth in the Memorandum below.

3. An Amended Scheduling Order will be issued providing additional time needed for the discovery permitted by this Order.

## MEMORANDUM

### I. PLAINTIFFS' MOTION TO COMPEL AND FOR SANCTIONS

#### A. *Motion to Compel*

■ This Court decided the majority of plaintiffs' Motion to Compel in its June 28, 2007 Order [Docket No. 140]. The only issue taken under advisement as to plaintiffs' Motion to Compel, pertained to Document Request No. 21.

Request No. 21 provides:

**REQUEST NO. 21:** The following documents regarding Defendant:

a. The articles of incorporation and by-laws;

b. The most recent annual report of Defendant;

c. The most recent year-end balance sheet of Defendant;

d. The most recent financial statement of Defendant's assets, gross income, net income, liabilities, and net worth; and

e. All 10–Q and 10–K reports submitted to the United States Securities and Exchange Commission by Defendant from 2003 to the present.

**RESPONSE:** Defendants incorporate their Preliminary Statement and General Objections as though fully set forth herein. Defendants object to this Request to the extent it is overly broad, not relevant, and not likely to lead to the discovery of admissible evidence because Defendant ABMI is not, and never has been, the employer of Plaintiffs. Defendants further object to this Request as not likely to lead to the discovery of admissible evidence and not relevant. Defendants further object to this Request on the grounds that some of the requested information is available through publicly available sources including but not limited to EDGAR. Subject to

and without waiving their objections, Defendants state that responsive, non-privileged documents will be made available for review and copying at the offices of Greene Espel at a mutually convenient time.

According to plaintiffs, in response to this document request, they were provided with no financial records of American Building Maintenance Co. of Kentucky ("ABM Kentucky"), except for a few redacted state tax forms and a few redacted spreadsheets generated by ABM Industries Inc., Janitorial, ("ABM Janitorial"). *See* Plaintiffs' Memorandum of Law in Support of their Motion to Compel and for Sanctions ("Pls.' Sanctions Mem.") at pp. 32–33. Plaintiffs asserted that the financial data from these spreadsheets is probative of whether ABM Kentucky is merely a corporate shell, rather than plaintiffs' employer, and that the documents could be designated as "attorney's eyes only" under the protective order in place in order protect any confidential information. *Id.* Defendants opposed producing financial data regarding ABM Kentucky to plaintiffs on the grounds that plaintiffs' attorney is legal counsel for the union representing their employees.

The Court ordered defendants to produce to the Court the redacted and unredacted financial documents provided to plaintiffs in a redacted format in order to perform an *in camera* inspection.

Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party. Relevant information need not be admissible at the trial if the discovery sought appears reasonably calculated to lead to the discovery of admissible evidence at trial. *See* Fed. R.Civ.P. 26(b)(1) ("parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party."); *see also Minnesota Specialty Crops, Inc. v. Minnesota Wild,* 210 F.R.D. 673, 675 (D.Minn.2002) ("Generally, discovery

may inquire into all information, not otherwise privileged, that is relevant to the subject matter of the action, provided that it is reasonably calculated to lead to the discovery of admissible evidence."); *Walker v. Northwest Airlines Corp.,* No. Civ. 00–2604 MJD/ JGL, 2002 WL 32539635 at *1 (D.Minn., Oct.28, 2002) ("In the context of discovery, 'relevant' has been defined as encompassing 'any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case.' ") (quoting *Hickman v. Taylor,* 329 U.S. 495, 501, 67 S.Ct. 385, 91 L.Ed. 451 (1947)).

Having reviewed the unredacted the spreadsheets produced by defendants, this Court concludes that these spreadsheets contain no specific information regarding ABM Kentucky and never refer to ABM Kentucky. Thus, plaintiffs' motion to compel the unredacted spreadsheets is denied as the Court can discern nothing relevant in these documents bearing on plaintiffs' theory that ABM Kentucky is nothing more than a shell corporation.[1]

### B. *Plaintiffs' Motion for Sanctions*

█ Plaintiffs initially brought a motion for a protective order to avoid providing defendants with all of the social security numbers they have used over their entire lifetime. *See* Docket No. 13. In response to that motion, defendants represented that they only sought plaintiffs' social security numbers in order to obtain medical records and records regarding any legal proceedings to which plaintiffs had been a party. On September 21, 2006, this Court denied plaintiffs' motion for a protective order, in part, as follows:

Plaintiffs' Motion for a Protective Order is **DENIED** as it relates to defendants' request for social security numbers. On or before **September 30, 2006,** each plaintiff shall provide to defendants' counsel all so-

---

1. The Court questions whether defendants indeed did produce to it the redacted and unredacted financial records regarding ABM Kentucky referenced by plaintiffs in their motion, and ordered produced by this Court for the *in camera* inspection. In this regard, defendants produced the unredacted versions of the redacted documents,

bates numbered ABM07915–07928. Consequently, if it turns out that plaintiffs were seeking to obtain unredacted versions of documents other than the documents delivered to the Court, the Court would be willing to revisit plaintiffs' motion with respect to Document Request No. 21.

cial security numbers used by that plaintiff over the last 10 years. Defendants' counsel shall only use these social security numbers for the purpose of obtaining medical records from the providers identified by each plaintiff in response to Interrogatory No. 11 and for no other purpose, and these social security numbers shall not disclosed to defendants or their agents. Use of the social security numbers for any other purpose without Court permission will result in severe sanctions to defendants, its agents, and legal counsel.

September 21, 2006 Order [Docket No. 29] at p. 2, ¶ 2 (emphasis added). The Court explained the reasoning for its decision regarding the production of social security numbers in the Memorandum following its Order as follows:

> In this case, defendants are not contending that they are entitled to plaintiffs' social security numbers in order to show plaintiffs' immigration status. Instead, defendants have represented that they will only use the social security numbers given to them to ensure that they receive all relevant medical and legal records pertaining to plaintiffs.
>
> This Court must balance the probative nature of the information sought against the prejudice to be suffered by plaintiffs if this information is produced. This Court finds that the social security numbers used by each plaintiff in the past 10 years are needed to assist defendants in their efforts to obtaining plaintiffs' medical records for this same period. Thus, as the social security numbers will only be used for this purpose and not to inquire about plaintiffs' immigration status, the probative nature of the request outweighs the potential of any prejudice to plaintiffs. This Court rejects any contention that allowing defendants to obtain plaintiffs' social security numbers for the limited purpose of obtaining complete medical records, in order to defend against plaintiffs' claims for emotional damages, raises the specter of deportation. Any fear by plaintiffs that their social security numbers could be misused should be alleviated by the fact that this information shall only be released to defendants' counsel for their use and will not to be provided to defendants or its agents, and that defendants, their agents and legal counsel shall be subjected to severe sanctions if plaintiffs' social security numbers are used for any purpose other than obtaining medical records.

*Id.* at pp. 12–13.

During the April 25–26, 2007 deposition of plaintiff Estela Laureano ("Laureano") defendants' attorney, Jacqueline Mrachek ("Mrachek") asked Laureano questions regarding the social security numbers listed her on application:

> Q: Whose handwriting is the Social Security number?
>
> MR. CUMMINS: Objection. I'm going to instruct her not to answer, that it's irrelevant.
>
> Q: Whose Social Security number is xxx-xx–xxxx?
>
> MR. CUMMINS: Same objection, same instruction. Instruct you not to answer.
>
> Q: Are you going to follow your attorney's instructions?
>
> MR. CUMMINS: Now, you know that question is inappropriate. You're badgering the witness.
>
> MS. MRACHEK: I think this question is required, and I'm hardly badgering the witness. Are you going to answer the question?
>
> MR. CUMMINS: Ms. Laureano, I'm instructing you not to answer.
>
> A: No.

June 8, 2007 Affidavit of Justin D. Cummins ("June 8, 2007 Cummins Aff."), Ex. 18 (Laureano Dep.) at pp. 95–96.

During the subsequent deposition of plaintiff Miriam Pachecho ("Pachecho"), defendants' counsel, Mary Schultz ("Schultz") asked questions regarding whether Pachecho had an issue arising at work about a social security number that she had given her employer. *Id.*, Ex. 22 (Pachecho Dep.), pp. 401–02. Cummins and Schultz then had a dispute as to the meaning of this Court's September 21, 2006 Order. *Id.* at pp. 404–406. Cummins interpreted the Order to prohibit any use of plaintiffs' social security numbers, except for obtaining medical records. *Id.* at p.

404. On the other hand, Schultz read the Order more narrowly to mean that defendants could not misuse the social security numbers (*i.e.*, turn plaintiffs in for immigrations violations) produced by plaintiffs for the purposes of obtaining medical documents. *Id.* at pp. 405–06. According to Schultz, her line of questioning for Pachecho did not involve asking her for her social security numbers, but rather sought information as to whether she had been advised by her employer that there was an issue relative to the social security number she had provided to the corporation. *Id.* at p. 406. Further, Schultz asserted that defendants did not need access to all of plaintiff's social security numbers because as her employer, defendants already had social security numbers provided by Pachecho. *Id.* at p. 407. Cummins then claimed that this line of questioning went to plaintiff's immigration status, and it was for that reason that he was instructing Pachecho not to answer. *Id.* at pp. 408–09. Schultz then proceeded with the following line of questioning:

BY MS. SCHULTZ:

Q: Ms. Pachecho, in the spring or the summer of '05, was it determined that you had been providing incorrect information to ABM about your social security number?

MR. CUMMINS: Same objection. Ms. Pachecho, I'm instructing you not to answer.

BY MS. SCHULTZ:

Q: In the spring or summer of '05, Ms. Pachecho, did your employer come to the belief that you had provided your employer incorrect information regarding your social security number?

MR. CUMMINS: Same objection, same instruction. Do not answer Ms. Pachecho.

BY MS. SCHULTZ:

Q: In the spring or summer of '05, Ms. Pachecho, did the company ask you to clarify what social security number you were using so that they could respond to the Social Security Administration?

MR. CUMMINS: Same objection, same instruction not to answer Ms. Pachecho.

BY MS. SCHULTZ:

Q: In the spring or summer of '05, Ms. Pachecho, did you provide a different social security number to ABM than the one that you had been using before for purposes of your paycheck?

MR. CUMMINS: Same objection, same instruction not to answer Ms. Pachecho.

Q: In the spring or summer of '05, Ms. Pachecho, were you disciplined by your employer or in any way warned about using a different social security number than the one that the Social Security Administration had for you?

MR. CUMMINS: Same objection, same instruction not to answer Ms. Pachecho.

*Id.* at pp. 409–11.

Immediately after finishing Pachecho's deposition of Miriam, Schultz also took the deposition of plaintiff Azucena Garcia ("Garcia"). During that proceeding, defendants' counsel, Schultz, read portions of the September 21, 2006 Order into the record. *Id.*, Ex. 13 (Garcia Dep.) at pp. 267–69. Schultz also argued that the questioning regarding Garcia's use of social security numbers was relevant to the issue of plaintiff's credibility. *Id.* at p. 279. Schultz then proceeded to ask Garcia the following questions regarding her use of social security numbers:

Q: Now, at the time that you worked for Drop Ship as Veronica Perez and the time you were working at Arby's as Azucena Garcia Perez, were you using different Social Security numbers at both of those employers?

MR. CUMMINS: Ms. Garcia, do not answer. Objection, going to immigration status, and harassing the witness, quite frankly, Counsel—

MS. SCHULTZ: Are you directing—

MR. CUMMINS: Yes. I'm directing her not to answer. It seems to be a direct violation of the court order.

Q: Ms. Garcia, at the time you worked for Arby's and your work at the temporary agency, were you using different Social Security numbers?

MR. CUMMINS: Ms. Garcia, do not answer. Same objection. I'm instructing you not to answer because this is contrary to the court order, contrary to governing

law, it's harassing and intimidating the witness.

*See* Garcia Depo. at pp. 282–83.

Plaintiffs brought the present motion for sanctions and asked for the imposition of financial penalties against defendants for using tactics meant to harass plaintiffs in violation of this Court's September 21, 2006 Order. *See* Pls.' Sanctions Mem. at p. 24. Plaintiffs maintained that the imposition of financial penalties against defendants is appropriate for their use of *in terrorem* tactics in violation of this Court's September 21, 2006 Order. *Id.* Plaintiffs argued that defendants' questions regarding their social security numbers on "credibility" grounds violated the mandates of this Court's Order, and cited to the following portion of the September 21, 2006 Order in support of this assertion: "defendants, their agents and legal counsel shall be subjected to severe sanctions if plaintiffs' social security numbers are used for any purpose other than obtaining medical records." *Id.* at pp. 21–22. Plaintiffs also asserted that such questioning was retaliatory and went against governing precedent.[2] *Id.* at p. 23.

Defendants countered that the Court's Order limited discovery to plaintiffs providing their social security numbers for the purpose of obtaining medical records, and precluded defendants from inquiring about plaintiffs' immigration status. *See* Defendants' Memorandum of Law in Opposition to Motion to Compel ("Defs.' Opp. Mem.") at p. 16. However, defendants claimed that the Order did not address the issue of whether defendants were prevented from asking questions of plaintiffs in their depositions regarding their social security numbers as it related to credibility. *Id.*

Rule 37(b) of the Federal Rules of Civil Procedure provides for sanctions for the violation of discovery orders, which include protective orders issued under Federal Rule of Civil Procedure 26(c). *See Schiller v. City of New York*, No. 04 Civ. 7921 KMK/JCF, 2007 WL 1623108 at *3 (S.D.N.Y.2007)

(string citation omitted). Further, the Court has the inherent power to assess attorneys' fees as a sanction for willful disobedience of a protective order. *Greiner v. City of Champlin*, 152 F.3d 787, 789 (8th Cir.1998) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)); *see also Excellus Health Plan, Inc. v. Tran*, 222 F.R.D. 72, 73 (W.D.N.Y.2004) ("Of course, violations of the protective order's provisions are subject to the full range of sanctions available pursuant to the Federal Rules of Civil Procedure and the inherent power of the court.") (citation omitted).

This Court finds that sanctions against defendants are not appropriate based on this Court's September 21, 2006 Order and the facts presently before the Court on plaintiffs' motion. First, this Court's Order only explicitly restricted the use of the social security numbers *ordered produced by the Court* for the purposes of obtaining medical records. *See* September 21, 2006 Order [Docket No. 29] at p. 2, ¶ 2. There is no evidence in the record to suggest that defendants were using the social security numbers provided to them by virtue of this Court's Order during the relevant depositions. To the contrary, at least as it pertains to the depositions of Pachecho and Laureano, defendants were referring to social security numbers plaintiffs provided to their employer. *See* June 8, 2007 Cummins Aff., Ex. 22 (Pachecho Dep.), pp. 409–11; Ex. 18 (Laureano Dep.) at pp. 95–96. Further, plaintiffs' counsel stated during the July 11, 2007 hearing that the employer already had plaintiffs' social security numbers. *See* Transcript of July 11, 2007 Hearing [Docket No. 150] ("Tr.") 30. The plain language of the Order only applies to social security numbers produced by plaintiffs pursuant to the September 21, 2006 Order, and plaintiffs have not demonstrated to the Court that defendants used these social security numbers in violation of that Order.

Second, the Court only restricted the discovery of the social security numbers obtained from plaintiffs for the purpose of in-

---

**2.** As part of the sanctions motion, plaintiffs also directed this Court to what it characterized as improper questioning by defendants' counsel regarding one of the plaintiff's sexual activity with her husband. *Id.* at p. 22. This questioning has no bearing on whether defendants improperly inquired about plaintiffs' use of social security numbers.

quiring about plaintiff's immigration status. The Court did not address defendants' use of *their own information or records* regarding any particular plaintiff's social security numbers for any other purpose, much less for credibility purposes.

While this Court has now concluded in conjunction with defendants' motion to compel that asking plaintiffs about their social security numbers is not an appropriate inquiry for credibility purposes, (*see* Section II.D, *infra* ), the Court reaches this conclusion independent of its September 21, 2006 Order. Thus, there is no basis for imposing sanctions on defendants and their counsel for their questions regarding plaintiffs' use of their social security numbers at this time.

For all the reasons stated above, plaintiffs' motion for sanctions is denied.

## II. DEFENDANTS' MOTION TO COMPEL

### A. *Motion to Compel Medical Information, Authorizations and Records*

█ This case arises out of plaintiffs' claims of sexual harassment, discrimination, and retaliation under Title VII and the Minnesota Human Rights Act ("MHRA") against defendants. *See* Amended Complaint, ¶¶ 294–302. In their Amended Complaint, plaintiffs state that they are seeking "garden variety" emotional distress damages from defendants. *Id.*, ¶ 293. Defendants have sought to discover plaintiffs' medical and mental health history for the past 10 years through Interrogatory No. 11 and Document Request No. 9, which provide as follows:

INTERROGATORY NO. 11: Identify any and all physicians, psychologists, psychiatrists, therapists, hospitals, medical personnel, medical facilities, counselors, mental health professionals, or any other person or facility that examined, treated or otherwise had contact with you pertaining in any way to your physical, mental and/or emotional condition, the diagnosis thereof (if one is made), and/or the prognosis thereof (if determined) for the period from January 1, 1996 to the present.

For each identify:

a. the dates of all treatment, sessions and/or examination;

b. the nature of all treatment, sessions, and/or examination;

c. the diagnosis for all treatment and/or examination; and

d. any recommendations for on-going treatment including therapy or counseling.

For each identified, complete and execute an Authorization to Release Medical records attached hereto.

REQUEST NO. 9: Any and all documents in your possession or under your control pertaining in any way to your physical, mental and/or emotional health; and/or physicians, medical personnel, hospitals, medical facilities, therapists, counselors, psychologists, psychiatrists, mental health personnel, mental health facilities, or any other person or facility that treated, examined, or otherwise had any contact with you pertaining in any way to your physical, mental and/or emotional condition, the diagnosis thereof, and/or the prognosis thereof.

Plaintiffs previously brought a motion for a protective order on August 30, 2006 [Docket No. 13], arguing that the medical privilege prohibited defendants from obtaining medical records and authorizations for the release of medical records. *See* Plaintiffs' Memorandum in Support of Motion for Protective Order [Docket No. 15] at p. 7. In particular, plaintiffs contended that they had not waived the medical privilege because they did not place their mental health at issue by only alleging "garden variety" emotional distress, and they were not relying on any medical testimony or expert witnesses to establish their causation and damages. *Id.* at pp. 7– 10.

On September 21, 2006, this Court granted in part and denied in part plaintiffs' motion for a protective order, holding as follows:

Plaintiffs' Motion for a Protective Order is **GRANTED** in part and **DENIED** part as it relates to defendants' request for medical records as follows: With respect to Interrogatory No. 11, on or before **September 30, 2006,** each plaintiff shall an-

swer and identify all medical providers (as defined by the interrogatory) seen for diagnosis or treatment for mental, emotional and psychological issues during the past ten years. In addition, on or before **September 30, 2006,** plaintiffs shall provide to defendants executed authorizations directed to the providers identified in response to Interrogatory No. 11 to obtain all medical records pertaining to any diagnoses or treatment for mental, emotional and psychological issues during the past ten years. With respect to Document Request No. 9, on or before **October 30, 2006,** each plaintiff shall produce to defendants all documents in their possession pertaining to any diagnoses or treatment for mental, emotional and psychological issues during the past ten years. Defendants are not entitled to information regarding any other medical providers or any other medical records from plaintiffs or their providers.

September 21, 2006 Order [Docket No. 29] at p. 2 (emphasis in original). In reaching this conclusion, the Court noted that plaintiffs were seeking more than nominal damages, as the only source of their damages were their claims of emotional distress, and that "plaintiffs may not hide behind a claim of privacy to keep their medical records from defendants." *Id.* at p. 8. However, while the Court concluded that plaintiffs' mental health records were relevant to the claims in their Complaint, it also noted that plaintiffs had not alleged physical ailments or illnesses. *Id.* at p. 9. As a result, the Court held that "defendants [were] only entitled to discover those medical records that reflect mental health issues, and *the manifestations of those mental health issues,* and [they were] not entitled to obtain information and records for other illnesses, physical ailments or injuries." *Id.* (emphasis added).

After this Court's Order, plaintiffs testified at their depositions about physical manifestations of the emotional distress they suffered at the hands of defendants as follows:

- Marlene Giron ("Giron") testified that she suffers from and has received treatment for migraine headaches, gastritis and an ulcer. *See* Affidavit of Nancy E. Brasel ("Brasel Aff."), Ex. 3 (Giron Dep.) at pp. 25–27, 35–37, 39, 42–46, 194–95. Giron also testified that she is seeking recovery for these ailments as a part of the present lawsuit. *Id.* at pp. 42, 45–46, 195, 197.

- Arminda Gomez ("Gomez") testified she suffers from and has received treatment for an ulcer, headaches, lack of sleep, nervousness, backaches, and high blood pressure, although she was uncertain as to whether she would be seeking compensation for these ailments from defendants. *See* Brasel Aff. Ex. 4 (Gomez Dep.) at pp. 8–13, 144–48, 150–53, 157–164.

- Francisca Sandoval ("Sandoval") testified that she suffered a relapse in epileptic attacks as a result of defendants' actions, and that she is claiming this relapse as damages in this lawsuit. *See* Brasel Aff. Ex. 12 (Sandoval Dep.) at pp. 231–33. She also testified she has suffered emotional harm due in part to defendants' conduct. *Id.* at p. 28.

- Ines Hernandez ("Hernandez") testified that she had experienced a back injury, headaches and insomnia and is seeking to be compensated for her back injury. *See* Brasel Aff., Ex. 6 (Hernandez Dep.) at pp. 28–31, 57, 401–03, 404, 466. Hernandez also stated that she spoke with a doctor about her depression, which she alleges was caused by defendants. *Id.* at pp. 387, 392–93, 401.

- Laureano testified that she suffers daily from headaches. *See* Brasel Aff., Ex. 7 (Laureano Dep.) at pp. 253, 255. However, she has not seen a medical provider for the headaches. *Id.* at p. 255.

- Maria Perez ("Perez") testified that she suffers from and has received treatment for severe headaches, chest pains and fainting because of defendants' actions, and that she is seeking recovery for her ailments from defendants. *See* Brasel Aff., Ex. 10 (Perez Dep.) at pp. 251–59, 281–82.

- Nidia Guerrero ("Guerrero") testified that she suffers from headaches caused by defendants' actions and that she is seeking money from defendants to pay

for therapy. *See* Brasel Aff., Ex. 5 (Guerrero Dep.) at pp. 307, 321, 324–29.

- Lucila Marquez testified that she has suffered from headaches, depression and sleeplessness, for which she has sought medical treatment and medication, as a result of defendants' actions. *See* Brasel Aff., Ex. 8 (Guerrero Dep.) at pp. 19–21, 51, 53–57, 60–63, 66.

- According to defendants, Eva Reyes ("Reyes") testified that suffered from headaches but there is no indication that she sought medical treatment for this ailment. *See* Defendants' Memorandum in Support of Motion to Compel ("Defs.' Compel Mem.") at p. 6, citing to Brasel Aff., Ex. 11 (Reyes Dep.) at 449.

On March 16, 2007, defendants' counsel sent an email to plaintiffs' counsel to inquire about obtaining documents from plaintiff Hernandez's treating psychologist, who was first identified at her deposition, and from her treating chiropractor. *See* Brasel Aff., Ex. 15 (March 16, 2007 email from Mrachek to Cummins). Plaintiffs' counsel responded by claiming that plaintiffs are entitled to seek recovery for physical manifestations arising out of "garden-variety" emotional damages, and that the Court's September 21, 2006 Order only extended to the discovery of records related to mental ailments. *Id.* (March 16, 2007 email from Cummins to Mrachek). On April 19, 2007, defendants' counsel demanded that authorizations for medical records be provided by plaintiffs Giron, Gomez, Hernandez, Sandoval, and Marquez, given the testimony during their depositions that they were suffering from various ailments as the result of defendants' actions. *Id.* (April 19, 2007 email from Brasel to Cummins). On April 20, 2007, plaintiffs' counsel represented that in lieu of providing the requested medical records, they would stipulate that they would not use medical records or testimony to establish any sort of diagnosis or causation at trial. *Id.* (April 19, 2007 email from Brasel to Cummins).

Defendants argued that based on this Court's Order, and the binding authority in this Circuit, they are entitled to discovery into plaintiffs' medical records and history, particularly as they relate to the ailments or illnesses for which they are specifically seeking recovery in this lawsuit. *See* Defendants' Memorandum in Support of Motion to Compel ("Defs.' Compel Mem.") at p. 26. According to defendants, plaintiffs' refusal to abide by this Court's September 21, 2006 Order has hampered defendants' ability to take meaningful depositions of plaintiffs, to properly assess the need for an independent medical examination ("IME") of plaintiffs, and to obtain an expert witness. *Id.* at p. 27. As such, defendants seek production of plaintiffs' medical records and history, particularly as they relate to the ailments they are specifically seeking recovery for in this lawsuit. *Id.* at p. 26. In addition, defendants seek permission from this Court to reconvene the depositions of those plaintiffs whose medical records warrant further questioning of plaintiffs; an extension of discovery so as to allow defendants an appropriate amount of time to review the medical records, evaluate the need for an expert witness, and to retain an expert witness, if necessary. *Id.* at p. 27. Defendants have also requested an award of costs, including attorney's fees, relating to any further depositions of plaintiffs. *Id.*

In refusing to provide defendants with the medical records bearing on the various ailments about which Giron, Gomez, Sandoval, Hernandez, Laureano, Perez, Reyes, Guerrero and Marquez provided testimony, plaintiffs presented the very same arguments that they argued to this Court in connection with their motion for a protective order—*i.e.* that the appropriate inquiry into the production of medical records is whether the plaintiff waived the medical privilege, rather than whether the medical records are probative, and that waiver does not occur when an employee pursues claims of "garden variety" emotional distress, as such claims are insufficient to place the plaintiffs' mental condition "in controversy." *See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Compel ("Pls.' Opp. Mem.") at pp. 21–24. In addition, plaintiffs again cited in support of their position the very same cases they had previously relied upon in support of their motion for a protective order, including *Jaffee v. Redmond,* 518 U.S. 1, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996), *Dochniak v.*

*Dominium Management Services,* 240 F.R.D. 451, 453 (D.Minn.2006) and *Blake v. U.S. Bank,* File No. 03–6084 (PAM/RLE), 2004 WL 1908313 (D.Minn.2004). *See* Pls.' Opp. Mem. at pp. 23; Plaintiffs' August 30, 2006 Memorandum in Support of Motion for Protective Order [Docket No. 15] at pp. 7–10.

As an initial matter, this Court rejects plaintiffs' attempt to revisit and reargue the same position that they already had presented to this Court, and which it rejected in its September 21, 2006 Order, as it pertained to defendants' ability to obtain authorizations and medical records regarding plaintiffs' medical conditions. If plaintiffs disagreed with this Court's decision, the proper method for obtaining relief from it was to move for reconsideration or to appeal the Order to District Judge Richard Kyle, the presiding District Judge on this case. Plaintiffs did neither. Consequently, the Court finds that by refusing to provide to defendants the medical records and medical authorizations needed to obtain the medical records that clearly evidence the manifestations of plaintiffs' respective claims for emotional distress, plaintiffs are disobeying an outstanding discovery order. This Court does not countenance plaintiffs' effort to reargue cases that they had already presented to the Court in an effort to somehow circumvent the Court's previous ruling.

As the attorneys are well aware, there is a split of authority in this District as to whether the Rule 35 "in controversy" and "good cause" requirements that bear on independent medical examinations, apply to the production of medical records. For example, in *Dochniak,* Magistrate Judge Frank Noel concluded that the defendant was not entitled to the plaintiff's medical records as she had not placed her mental condition "in controversy" and had not waived her privilege as to her medical records. *See Dochniak v. Dominium Management Services,* No. Civ. 06–237JRTFLN, 2006 WL 3156539 at *1 (D.Minn. July 26, 2006). In coming to this conclusion, Magistrate Judge Noel found that the analysis for determining whether medical records were subject to production was not governed by the relevancy analysis dictated Rule 26(c), but instead, determined

that "the standard for whether a privilege has been waived is the same as the standard required for a Rule 35 physical or mental examination; that is, whether Plaintiff has put her physical or mental condition 'in controversy.'" *Id.* n. 1. Magistrate Judge Noel's Order was upheld by District Judge John Tunheim. *See Dochniak v. Dominium Management Services,* 240 F.R.D. 451, 452 (D.Minn.2006) (finding that Magistrate Judge Noel did not error in concluding that the standard for whether a privilege has been waived as to medical records and information is the same as the standard required for a Rule 35 physical or mental examination.). Similarly, Magistrate Judge Raymond Erickson has concluded that the "threshold showing of relevance" as to the production of medical documents, necessarily implicates Rule 35(a) "given the clear parallels between the analysis of whether a mental condition is 'in controversy,' for purposes of a mental health examination, and whether the issue of mental health is 'in controversy' for purposes of compelling a party to turn over her medical records." *Blake v. U.S. Bank Nat. Ass'n,* No. CIV 03–6084 PAM/RLE, 2004 WL 5254174 at *5 (D.Minn. May 19, 2004); *see also, O'Sullivan v. State of Minnesota,* 176 F.R.D. 325, 327 (D.Minn.1997) (Erickson, M.J.) (rejecting a claim that an allegation of emotional pain and distress, suffered at the instance of the defendants, is sufficient to satisfy the "in controversy" element).

On the other hand, relying on Fed.R.Civ.P. 26, the United States Supreme Court case *Schlagenhauf v. Holder,* 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964), and the Eighth Circuit case *Schoffstall v. Henderson,* 223 F.3d 818 (8th Cir.2000), Magistrate Judges Jonathan Lebedoff, Arthur Boylan and the undersigned have all concluded that the discoverability of medical records is governed by the relevancy standard of Rule 26, and not the "in controversy" standard required for an IME under Rule 35. *See Schlagenhauf,* 379 U.S. at 117, 85 S.Ct. 234 ("[I]n none of the other discovery provisions is there a restriction that the matter be 'in controversy,' and only in Rule 34 is there Rule 35's requirement that the movant affir-

matively demonstrate 'good cause.' "); [3] *Schoffstall*, 223 F.3d at 823 (finding that employee's claim of sex discrimination and emotional distress placed her medical condition at issue, making her medical records relevant, and, absent a showing of bad faith, discoverable); *Walker*, 2002 WL 32539635 at *4 (Lebedoff, M.J.) (finding that if plaintiff intended to seek anything more than nominal damages for any alleged emotional distress, then she had placed her mental condition into issue in the case, and based on Rule 26, defendants were entitled to explore any evidence, including plaintiff's medical records, which may be relevant to such a claim); *Mary Briel v. Chang O'Hara's Bistro, Inc. et al.*, Civil No. 03–6549. (RHK/AJB), at 4–5 (D.Minn. July 13, 2004) (Boylan, M.J.) (finding that where plaintiffs' primary damages were based on claims of emotional distress, and were at the crux of the case, plaintiffs' mental health was at issue, "resulting in the production of medical records under Rule 26, even when Rule 35 'in controversy' requirement, necessary to obtain an independent medical examination, had not been met"); *Doverspike v. Chang O'Hara's Bistro, Inc. et al.*, Civil No. 03–5601 (ADM/AJB) (D.Minn. July 13, 2004) (Boylan, M.J.) (same); *Schaadt v. St. Jude Medical*, Civil No. 05–1167 (RHK/JSM), at 9–10 (D. Minn. April 4, 2006) [Docket No. 36] (Mayeron, M.J.), *affd'*, May 5, 2006 Order [Docket No. 55] (Kyle, J.) (finding that even if a plaintiffs' physical or mental conditions were not "in controversy," for the purposes of Rule 35, medical records were still relevant under Rule 26 where a significant source of a plaintiffs' damages were based on her claim of emotional distress). [4]

For all of these reasons, this Court continues to hold, as it did in its September 21, 2006 Order, that defendants "are entitled to discover those medical records that reflect mental health issues, *and the manifestations of those mental health issues*, . . ." (emphasis added). As such, this Court grants defendants' motion to compel with respect to plaintiffs Giron, Gomez, Sandoval, Hernandez, Perez, Guerrero, Marquez, and Reyes (assuming that she did suffer from headaches, as defendants represented in their brief, and received any treatment for these headaches), and orders the following: [5]

1. With respect to Interrogatory No. 11, on or before October 31, 2007, each plaintiff, save for Laureano, shall supplement their answer and identify all medical providers (as defined by the interrogatory) seen for diagnosis or treatment for the ailments or issues listed below, and any other ailments or physical or mental manifestations they claim to be suffering as a result of the conduct of defendants, for the past ten years. In addition, on or before October 31, 2007, plaintiffs shall provide to defendants executed authorizations directed to the providers identified in their supplemental response to Interrogatory No. 11 to obtain all medical records pertaining to any diagnoses or treatment for the ailments or issues listed below for the past ten years, and any other ailments or physical or mental manifestations they claim to be suffering as a result of the conduct of defendants:

---

3. In fact, since 1970, the "good cause" standard was removed from Rule 34. *See* Fed.R.Civ.P. 34 advisory committee's note (1970).

4. The Supreme Court's holding in *Jaffee* is of no assistance to this Court's analysis. While the Court held that "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence," (518 U.S. at 15, 116 S.Ct. 1923), the issue of privilege in *Jaffee* arose in an entirely different context than that presented in the instant case. In that case, a police officer, who had fatally shot a person, was being sued by the decedent's estate for use of excessive force. The plaintiff sought notes from police officer's counseling sessions after the shooting. *Id.* at 5, 116 S.Ct. 1923. Unlike the instant case, the psychotherapy sessions did not form the basis of the underlying claim of excessive force, any claim for relief by the plaintiff, or any defense raised by defendants. Here, however, plaintiffs are seeking damages for emotional distress and have represented that this claim for relief is the only source of compensatory damages they are seeking in this case.

5. Defendants' motion to compel is denied as to plaintiffs Laureano and Reyes, as Laureano testified that she did not seek any treatment for her headaches and there is no indication that Reyes received treatment for her headaches.

- *Giron:* Migraine headaches, gastritis and an ulcer.
- *Gomez:* Ulcer, headaches, backaches, and high blood pressure.
- *Sandoval:* Epileptic attacks, injuries associated with physical abuse.
- *Hernandez:* Back injury, headaches, insomnia and depression.
- *Perez:* Headaches, chest pains and fainting.
- *Guerrero:* Headaches
- *Marquez:* Headaches, depression and sleeplessness.
- *Pachecho and Garcia:* any ailments or issues that they are claiming are the result of defendants' conduct (*e.g.*, headaches, insomnia, etc.)

2. Defendants may reconvene the deposition of any plaintiff to question that individual on any information obtained from her medical records that defendants did not have the opportunity to question plaintiffs about in her initial deposition, that was inconsistent with her testimony at the deposition, or that the plaintiff could not recall at her deposition.

3. Defendants shall have the opportunity to disclose experts and expert reports bearing on any plaintiffs' claim of emotional distress or damages flowing from a claim of emotional distress.

4. All of this discovery shall be completed within the deadlines set forth in the Third Amended Pretrial Scheduling Order issued contemporaneously with this Order.

### B. Questions Pertaining to the Meeting at the Union Building Between Plaintiffs and Counsel

Plaintiffs Hernandez, Reyes, Gomez and Pachecho asked a union representative, Elda Herman ("Herman"), for an attorney to deal with the sexual harassment that they were experiencing. *See* Brasel Aff., Ex. 14 (Herman Dep.) at pp. 400–01; June 25, 2007 Affidavit of Justin Cummins ("June 25, 2007

Cummins Aff."), Ex. 8 (Pachecho Dep.) at pp. 443, 445. Herman contacted plaintiffs' counsel, Cummins. *See* Brasel Aff., Ex. 14 (Herman Dep.) at p. 403. After speaking with Cummins, Herman told plaintiffs that other women were experiencing the same problems of sexual harassment and that if they were interested in being witnesses to stop this problem, she would give Cummins their telephone numbers. *Id.* at p. 404. Herman contacted those women who wanted access to a lawyer and wanted to talk to someone about what they had been through, and told them show up at a meeting located at the union office.[6] *See* June 25, 2007 Cummins Aff., Ex. 16 (Herman Dep.) at pp. 13–14, 422. The purpose of the meeting was to be able to talk to an attorney and see if he could take their case. *Id.* at p. 422

Plaintiff Guerrero testified that she found her present counsel as follows:

Q. How did you find your way to the attorneys that you hired in this lawsuit.

INTERPRETER BERNARDINO: At the union I was given a date in which some attorneys will be attending that were very interested regarding sexual harassment. On that day a lot of women—a lot of us women attended that meeting in which they were present. I think there were two attorneys and a woman.

Q. Two male attorneys and a woman?

INTERPRETER BERNARDINO: Yes.

Brasel Aff. Ex. 5 (Guerrero Dep.) at p. 209. According to plaintiffs' counsel, the first meeting between his firm and plaintiffs occurred on November 9, 2005.[7] *See* July 11, 2007 email from Cummins to Defendants' Counsel and the Court. The present action commenced in May of 2006.

During Guerrero's deposition, defendants' counsel asked her several questions regarding the meeting with plaintiffs' counsel, resulting in an instruction by plaintiffs' counsel not to answer on privilege grounds:

---

6. Herman testified that she was not privy to what occurred during the meetings. *See* June 25, 2007 Cummins Aff., Ex. 16 (Herman Dep.) at pp. 423, 426.

7. A second meeting occurred weeks after the first meeting. *See* June 25, 2007 Cummins Aff., Ex. 16 (Herman Dep.) at p. 423.

Q. When you attended this meeting with women from the company and the attorney from Miller–O'Brien, had you at the beginning of the meeting asked them to represent you?

MR. CUMMINS: I'm going to object to this line of questioning as getting into attorney/client information. Hang on. Where are you going with this, counsel? ... Her testimony indicates she was there to meet with attorneys regarding her legal issues. That we believe comes under the burden of attorney/client privilege. When you are seeking advice or counsel in anticipation of litigation or involving litigation, certainly the privilege attaches. So this line of questioning is inappropriate.

Q. At that meeting, and I don't—at that meeting were you asking the attorney for legal advice?

MR. CUMMINS: Nidia, do not answer. I'm instructing you not to answer as seeking attorney/client privilege information.

Q. At that meeting was your particular case discussed?

MR. CUMMINS: Same instruction, Ms. Guerrero. I'm instructing you not to answer pursuant to the attorney/client privilege.

Q. Was there any discussion about the terms of representation by the attorney?

MR. CUMMINS: Do not answer, Ms. Guerrero. I'm instructing you not to answer pursuant to the attorney/client privilege.

Q. What was the meeting a year ago with the other plaintiffs in this case at the union about?

MR. CUMMINS: Ms. Guerrero, I'm going to instruct you not to answer as seeking information subject to the attorney/client privilege.

Brasel Aff. Ex. 5 (Guerrero Dep.) at pp. 212–15, 266.

Defendants' counsel also asked questions of plaintiff Pachecho regarding what occurred at the meeting:

Q. Now, did you tell Mr. Cummins that your concern was that Miguel might be coming back to the building?

MR. CUMMINS: Objection, Ms. Pachecho, don't answer. I'm directing the witness not to answer as going to attorney-client privilege communications.

Q. Did you retain Justin Cummins the same day that you met him at the union office? Do you understand what I mean by that?

MR. CUMMINS: Objection, and same instruction, Ms. Pachecho.

Q. Ms. Pachecho, did you ask for Justin Cummins to come to the office and meet with you, to come to the union office and meet with you?

MR. CUMMINS: And Ms. Pachecho, I don't want you to disclose the nature of the communications.

Q. What did they discuss with you a bunch of women in the presence of Mr. Cummins?

MR. CUMMINS: Objection ... Counsel, are you asking for discussions that she had with the women in the presence of counsel or outside the presence of counsel.

Q. All right. Ms. Pachecho, during that meeting then with Mr. Cummins and these other people in this room, what did you tell Mr. Cummins about what you were interested in.

MR. CUMMINS: Ms. Pachecho, before you answer—you need to let me object first, Ms. Pachecho. I object as seeking attorney-client privileged information, and I'm instructing her not to answer on those grounds.

Q. Ms. Pachecho, I'm going to ask you some questions about what went on in that room, and if your attorney directs you not to answer, then obviously you need to comply with your attorney's directives. In that room did you tell Mr. Cummins that you wanted some advice as to how to deal with Miguel coming back to the building?

MR. CUMMINS: Objection and instruction to the witness not to answer.

Q. In that meeting were there other women who were asking Mr. Cummins about—well, what were the other women in the room asking Mr. Cummins about?

MR. CUMMINS: Ms. Pachecho, I'm instructing you not to answer, pursuant to the attorney-client privilege.

Q. What was Mr. Cummins telling you about what he could do for you?

MR. CUMMINS: Ms. Pachecho, I'm instructing you not to answer, pursuant to the attorney-client privilege.

Q. Did Mr. Cummins tell you that he was getting a lawsuit together to sue ABM?

MR. CUMMINS: Objection. Ms. Pachecho, I'm instructing you not to answer on the same grounds.

Q. Did Mr. Cummins tell you that he could add you as a plaintiff or complainant in the lawsuit?

MR. CUMMINS: Same objection. Ms. Pachecho, instruction not to answer. Counsel's testifying.

Q. Did Mr. Cummins tell you that ABM had a bad reputation of having supervisors harassing women and that he was going to put together a class action against the company?

MR. CUMMINS: Same objection, Ms. Pachecho. Do not answer, pursuant to the attorney-client privilege. Assumes facts not in evidence.

Q. Did Mr. Cummins ask you to be a part of a class that he wanted to pulled together to bring a lawsuit against ABM?

MR. CUMMINS: Same objection. Same instructions, Ms. Pachecho, not to answer.

Q. Did you tell Mr. Cummins that you did not want to be a part of a lawsuit?

MR. CUMMINS: Same objection. Same instruction not to answer.

Q. Did Mr. Cummins ever tell you that the proper way to handle your concern was to go to the company and report it to the company HR Department?

MR. CUMMINS: Same objections. Ms. Pachecho, same instruction not to answer.

Q. Did Mr. Cummins ever tell you that according to the company's sexual harassment policy there were a number of avenues that you could pursue to report your concerns to your employer instead of coming to him as an attorney?

MR. CUMMINS: Same objections, same instruction not to answer.

Q. Did Mr. Cummins encourage you to go to the company and make a report instead of being a plaintiff in a lawsuit against the company?

MR. CUMMINS: Same objections, same instruction not to answer. Form.

Q. Did Mr. Cummins give you his business card and tell you that if you wanted to participate in this lawsuit that you could give him a call?

MR. CUMMINS: Same objections, same instruction not to answer.

Q. By the end of the meeting did you tell Mr. Cummins that you wanted him to be your attorney?

MR. CUMMINS: Same objections, same instruction not to answer.

Q. Did these other women in the meeting encourage you to be part of a lawsuit?

MR. CUMMINS: Same objections, same instruction not to answer.

Q. Or was Mr. Cummins trying to convince the women in that room to be part of a lawsuit?

MR. CUMMINS: Same objection, same instruction not to answer, assumes facts not in evidence.

Brasel Aff. Ex. 9 (Pachecho Dep.) at pp. 456–58, 464, 466–70.

■ Defendants maintained that they are entitled to ask foundational questions of plaintiffs to determine if the attorney-client privilege applied to the communications that took place during the meetings at issue. *See* Defs.' Compel Mem. at p. 31. Defendants also argued that the presence of an attorney at the meeting in of itself is not sufficient to trigger the attorney-client privilege, and have characterized the meeting as being merely a solicitation for legal representation, which requires a finding that the attorney-client privilege did not attach to the communications made during the meeting. *Id.* at pp. 31–32. According to defendants, plaintiffs have failed to show that meeting in question was held in confidence for the purposes of obtaining legal advice. *Id.* at p. 33.

Plaintiffs responded by arguing that even though the meeting was attended by multiple persons for the purpose of obtaining legal advice, this does not render the communications any less privileged, as the attendees had a shared interest in potential litigation against a common adversary. *See* Pls.' Opp. Mem. at p. 43.

■ In general, confidential communications between individuals and attorneys for the purposes of obtaining or rendering legal advice are privileged. *See Upjohn v. United States,* 449 U.S. 383, 394–95, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981); *see also Fisher v. United States,* 425 U.S. 391, 403–04, 96 S.Ct. 1569, 48 L.Ed.2d 39, (1976); *United States v. Horvath,* 731 F.2d 557, 561 (8th Cir.1984). "The party asserting the attorney-client privilege . . . bears the burden to provide a factual basis for its assertions." *Triple Five of Minnesota, Inc. v. Simon,* 212 F.R.D. 523, 528 (D.Minn.2002) (citing *Hollins v. Powell,* 773 F.2d 191, 196 (8th Cir.1985)); *see also In re Grand Jury Proceedings,* 791 F.2d 663, 666 (8th Cir.1986).

■ This Court first finds that the attorney-client privilege attaches to preliminary discussions about representation between a lawyer and prospective client, even if the client decides not to employ the lawyer. *See In re Auclair,* 961 F.2d 65, 69 (5th Cir.1992) (citing McCormick on Evidence, § 88 (Cleary 3d ed.1984)); *Lonegan v. Hasty,* 436 F.Supp.2d 419, 435 n. 8 (E.D.N.Y.2006) (citations omitted). Without this protection, individuals' ability to seek legal advice would be constrained, as they would not feel safe approaching an attorney about a possible case. Defendants' reliance on *Auscape Intern. v. National Geographic Society,* 2002 WL 31250727 (S.D.N.Y. Oct.08, 2002) and *Morisky v. Public Service Elec. and Gas Co.,* 191 F.R.D. 419 (D.N.J.2000) for the proposition that communications or solicitations of prospective clients are not protected by the attorney-client privilege, is misplaced. *See* Defs.' Compel Mem. at pp. 21–32. *Auscape* involved a finding by the court that letters to prospective clients to encourage their involvement in a class action case and a proposed form of retainer agreement were not communications between attorney and client

and were not confidential, but instead more akin to direct mail advertising. 2002 WL 31250727 at *1. In *Morisky,* the Court concluded that completed questionnaires obtained at meeting by an attorney were not protected by the attorney-client privilege as the ultimate purpose of the questionnaire was to solicit potential clients, and there was no record of any direct communication between the attorney and possible clients before or during the time the questionnaire was being completed. 191 F.R.D. at 423–24. Here, the record supports plaintiffs' contention that they sought to speak with an attorney regarding the sexual harassment they were experiencing, and the meeting with attorneys was for that purpose. *See* Brasel Aff. Ex. 5 (Guerrero Dep.) at p. 209, Ex. 14 (Herman Dep.) at pp. 400–01; June 25, 2007 Cummins Aff. Ex. 8 (Pachecho Dep.) at pp. 443, 445, Ex. 16 (Herman Dep.) at pp. 13–14, 422. Further, unlike *Auscape* and *Morisky,* there was direct contact made by those women at the meeting and plaintiffs' present counsel.

■ Second, this Court finds that persons who consult an attorney together do not necessarily waive the attorney-client privilege, providing there is a common interest shared by the persons with respect to the subject matter of the communications. *See In re Auclair,* 961 F.2d at 69 (citation omitted). The common interest "may be 'either legal, factual, or strategic in character,' . . ." *In re Grand Jury Subpoena Duces Tecum,* 112 F.3d 910, 922 (8th Cir.1997) (quoting Restatement of Evidence § 126(1), cmt. e). The exception to waiver under the common interest principle is applicable to plaintiffs who can demonstrate a common goal and that the communications in question further that common interest. *See DepoMed, Inc. v. Ivax Corp.,* No. C–06–0100 CRB (JCS), 2007 WL 1792324 at *1 (N.D.Cal. June 19, 2007) ("In order to show a common-interest privilege, Plaintiff must demonstrate a common goal and that the documents or communications in question further that common interest."). In this case, the attendees' common interest was to speak to an attorney about their situation with regards to sexual harassment and to see if he would take their case.

This Court concludes that while plaintiffs' attorney improperly objected to certain foundational questions posed by defendants regarding the union building meeting (*e.g.* whether counsel was retained the day of the meeting; whether counsel was asked for legal advice; whether counsel was asked to come to the union office to meet with the plaintiff), based on the information that defendants did develop from various witnesses, it is clear that plaintiffs were seeking legal help from an attorney with regards to the sexual harassment they were allegedly experiencing in the workplace and that the meeting at the union building with the attorneys from the O'Brien firm was arranged for this purpose. Therefore, this Court has a sufficient foundation to conclude that the communications at that meeting between the plaintiffs and their prospective counsel (who later became their actual legal counsel), were protected by the attorney-client privilege. *See* Brasel Aff. Ex. 5 (Guerrero Dep.) at p. 209, Ex. 14 (Herman Dep.) at pp. 400–01; June 25, 2007 Cummins Aff., Ex. 8 (Pachecho Dep.) at pp. 443, 445; Ex. 16 (Herman Dep.) at pp. 13–14, 422.

### C. *Plaintiffs' Awareness of the Facts and Allegations Contained in the Amended Complaint and Affidavits*

Defendants complain that throughout their depositions, plaintiffs testified that they were unaware of allegations and claims of gender discrimination added by them to their revised sworn affidavits and to their Amended Complaint. *See* Defs.' Compel Mem. at p. 10. Moreover, defendants asserted that plaintiffs' counsel on some occasions objected to questions regarding plaintiffs' awareness of the allegations made by them in their sworn statements and in the Amended Complaint based on the attorney-client privilege and on other occasions did not. *Id.* In particular, defendants claimed that plaintiffs' counsel allowed Garcia, Perez, Giron, Gomez

and Sandoval to answer questions regarding their knowledge of the facts and allegations pertaining to the claims of gender discrimination; objected to questions posed to Laureano regarding what knowledge she had to support the allegation of sexual discrimination, but allowed her to answer with a caution not to reveal any communications with counsel; instructed Guerrero not to answer questions regarding whether defendants' activities were part of a pattern or practice of discrimination and whether she had any information to support the assertion that defendants engaged in a pattern or practice of discrimination; and instructed Hernandez not answer whether she asked for certain allegations to be added to her charge, but then allowed Hernandez to answer the question. *Id.* at pp. 10–12.

Defendants also took issue with the following conduct of plaintiffs' counsel: not being allowed to ask Garcia if she had seen the Complaint in this action or whether she had heard about what other people had reported about her; not being allowed to get answers from Marquez as to what led to her filing a charge with the EEOC; and not being allowed to ask Perez why she did not include a particular incident in her charge of discrimination. *Id.* at pp. 14–16. According to defendants, these questions were relevant to their theory that this lawsuit has been orchestrated union and its attorneys. *Id.* at p. 14. Defendants asserted that they are entitled to answers to the questions, summarized in Exhibit 23 of Brasel's Affidavit ("Exhibit 23"), that pertain to factual information that plaintiffs had to support claims made in the Complaint, plaintiffs' understanding of any of the claims in the Complaint, or their role in this lawsuit. *Id.* at pp. 30–31. Defendants also maintained that all plaintiffs should be required to answer all of these questions, given the inconsistent objections made by plaintiffs' counsel to the same question.[8] *Id.* at p. 31.

---

**8.** The only inconsistency that defendants have described is the fact that plaintiffs' counsel allowed Garcia, Perez, Giron, Gomez and Sandoval to answer questions regarding their knowledge of the facts and allegations pertaining to the claims of gender discrimination, while plaintiffs' counsel instructed Guerrero not to answer ques-

tions regarding whether she had information that defendants' activities were part of a pattern or practice of discrimination and whether she had any information to support the assertion that defendants engaged in a pattern or practice of discrimination. *See* Pls.' Mem. at pp. 10–13. This Court's review of Exhibit 23 showed that

Plaintiffs countered that defendants obtained plaintiffs' knowledge of the facts set forth in the Amended Complaint during their depositions and that plaintiffs had the right and an obligation to preserve the attorney-client privilege by objecting to defendants' questions. *See* Pls.' Opp. Mem. at p. 41.

"A person may instruct a deponent not to answer only when necessary to preserve a privilege, ..." Fed.R.Civ.P. 30(d)(1). Further, a defendant "is entitled to obtain testimony from plaintiffs as to their understanding or appreciation of the allegations and any facts of which they are aware that support those allegations." *Schmidt v. Levi Strauss & Co.*, No. C04–01026 RMW (HRL), 2006 WL 3820984 at *2 (N.D.Cal. Dec.26, 2006). This Court also notes that the attorney-client privilege:

> [E]xtends only to communications and not to facts. A fact is one thing and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney.

*Upjohn Co.*, 449 U.S. at 395–96, 101 S.Ct. 677 (citation omitted).

Given, this backdrop, this Court reviewed the questions set forth in Exhibit 23 relating to plaintiffs' knowledge of the allegations and facts in the present lawsuit to determine if they were protected by the attorney-client privilege. If they were not, plaintiffs will be required to provide additional deposition testimony as to those questions.

*Plaintiff Garcia.* This Court finds that questions 1, 2, 6, 12, 13, 14, 15 and 27 in Exhibit 23 were not seeking attorney-client communications and the objections were improper; questions 3–5, 7, 8, 26, 31–35 and 39–41 are not at issue as plaintiffs' attorney did not instruct Garcia not to answer the questions; and questions 9, 16–18, 25, 28, 29 and 30 were improper questions, because they sought information protected by the attorney-client privilege or the marital privilege. Therefore, defendants shall be permitted to redepose Garcia and ask her questions 1, 2, 6, 12–15 and 27.

*Plaintiff Giron.* This Court finds that question 1 in Exhibit 23 was not seeking attorney-client communications and the objections were improper. Giron shall be required to answer the questions.

*Plaintiff Guerrero.* This Court finds that questions 6, 7, 8, 10, 11, 12 and 13 in Exhibit 23 were not seeking attorney-client communications and the objections were improper; and question 9 is not at issue, as plaintiffs' attorney did not instruct Guerrero not to answer the question. Defendants shall be permitted to redepose Guerrero and ask her questions 1, 6, 7, 8, 10, 11, 12 and 13.

*Plaintiff Hernandez.* This Court concludes that questions 5, 10, 11, 12, and 13 in Exhibit 23 were not seeking attorney-client communications and the objections were improper; questions 6, 7, 8 are not at issue as plaintiffs' attorney did not instruct Guerrero not to answer the questions; and questions 3, 4, 9, 10 and 11 were improper questions, as they sought information protected by the attorney-client privilege. Defendants shall be permitted to redepose Hernandez and ask her questions 5, 10, 11, 12 and 13.

*Plaintiff Laureano.* This Court finds that questions 4 and 5 are not at issue, as plaintiffs' attorney did not instruct her not to answer the questions.

Garcia, Perez, Giron, Gomez and Sandoval were not asked any questions regarding whether defendants' activities were part of a pattern or practice of discrimination. Instead, these plaintiffs were asked questions regarding their knowledge of claims that defendants posted jobs according to sex and whether certain positions are staffed entirely by either women or men. This Court notes that Exhibit 23 sets forth that Perez and Pachecho were asked questions regarding whether they had any information about a pattern of practice of discrimination at ABM. However, the citation provided for Perez's deposition, page 143, makes no mention of this inquiry. *See* Brasel Aff. Ex. 10 (Perez Dep.). Further, the citation for Pachecho, page 496, was not provided to this Court for review. *Id.*, Ex. 9 (Pachecho Dep.). As such, this Court cannot find that plaintiffs took an inconsistent position regarding instructions to plaintiffs not to answer. Regardless, any inconsistent objections by plaintiffs, as alleged by defendants, would not warrant requiring plaintiffs to answer all of the questions set forth in Exhibit 23.

*Plaintiff Marquez.* This Court finds that questions 1, 3 and 4 in Exhibit 23 were not seeking attorney-client communications and the objections were improper. Therefore, defendants shall be permitted to redepose and ask her these questions. Question 2 is not at issue, as plaintiffs' attorney did not instruct Marquez not to answer the question.

*Plaintiff Pachecho.* This Court concludes that question 8 was an improper question, as it sought information protected by the attorney-client privilege; and that question 30 is not at issue, as plaintiffs' attorney did not instruct Pachecho not to answer the question.[9]

*Plaintiff Perez.* This Court concludes that question 7 in Exhibit 23 was not seeking attorney-client communications and the objections were improper, and that question 9 was proper to the extent it sought plaintiff's knowledge regarding why an incident was not included in her charge of discrimination, as opposed to any communications to her by her attorneys as to why an incident was not included in her charge of discrimination. Questions 2, 4, 5 and 8 are not at issue as it does not appear that plaintiffs' attorney did not instruct Perez not to answer these questions. Defendants shall be permitted to redepose and ask Perez questions 7 and 9.[10]

The depositions of plaintiffs contemplated by this decision shall be completed by the deadline set forth in the Third Amended Pretrial Scheduling Order issued contemporaneously with this Order.

**D. *Inquiries into Plaintiffs' Use of Names and Social Security Numbers***

■ Defendants have requested an order compelling plaintiffs to answer deposition questions regarding the various names and social security numbers allegedly used by plaintiffs, as such questioning is relevant to the issue of plaintiffs' credibility. *See* Defs.' Compel Mem. at pp. 20–21, 33–34. Plaintiffs

argued that such questioning is impermissible under this Court's September 21, 2006 Order and is also impermissible as an inquiry into plaintiffs' immigration status.[11] *See* Pls.' Opp. Mem. at pp. 44–45.

As stated previously, this Court found that the plain language of September 21, 2006 Order only applies to social security numbers produced pursuant to the Order. There was no specific finding by the Court as to whether defendants could ask plaintiffs questions regarding social security numbers that were obtained by defendants using means outside of this Court's Order.

Defendant employers may not use the discovery process to delve into a plaintiff's immigration status. *See E.E.O.C. v. The Restaurant Co.,* 448 F.Supp.2d 1085, 1087 (D.Minn.2006). Allowing employers to inquire into a plaintiff's immigration status in employment cases would allow employer to implicitly raise threats of negative consequences (*i.e.* being subjected to deportation or criminal persecution) when a worker reports illegal practices. *See Rivera v. NIB-CO, Inc.,* 364 F.3d 1057, 1065 (9th Cir.2004). In addition, while credibility is always at issue, it does not automatically open the door to an employer to conduct an unlimited inquiry into immigration status when such an inquiry would impose an undue burden on the private enforcement of the employment laws. *See Rengifo v. Erevos Enterprises, Inc.,* No. 06 Civ. 4266(SHS)(RLE), 2007 WL 894376 at *3 (S.D.N.Y. March 20, 2007) (citing *Avila–Blum v. Casa de Cambio Delgado, Inc.,* 236 F.R.D. 190, 192 (S.D.N.Y.2006)). Consequently, courts have rejected a party's attempt to discover information regarding a claimant's use of social security numbers that may serve as a "back door" effort to learn of a plaintiff's immigration status. *See e.g. E.E.O.C. v. First Wireless Group, Inc.,* No. 03–CV–4990(JS)(ARL), 2007 WL 586720 at *2 (E.D.N.Y. Feb. 20, 2007); see also *Rengifo,* 2007 WL 894376 at *2; *E.E.O.C. v. Bice of*

---

9. Neither party attached Pachecho's deposition testimony as to question 30 (p. 496). Thus, this Court's ruling is based on defendants' representation of this testimony.

10. This Court notes that there were no questions directed to Reyes and Sandoval regarding plain-

tiffs' knowledge of the allegations and facts in this case.

11. Examples of such questions posed to plaintiffs can be found in Section I.B, *supra,* of this Order.

*Chicago,* 229 F.R.D. 581, 582–83 (N.D.Ill. 2005).

This Court finds that the minimal bearing that using multiple social security numbers may have on plaintiffs' credibility does not outweigh the chilling effect it would have on them as victims of sexual harassment from coming forward to assert their claims. *See Bice of Chicago,* 229 F.R.D. at 583; *see also Rengifo,* 2007 WL 894376 at *2. As such, this Court denies defendants' motion to require plaintiffs to answer questions regarding their use of different social security numbers. Having reached this conclusion, however, defendants are free to address plaintiffs' credibility and propensity for dishonesty by asking them about their use of aliases or false names, so long as plaintiffs are not asked why they engaged in such untruthful conduct. *See Bice,* 229 F.R.D. at 583 (finding that while "[d]efendants can inquire about whether aliases or false names were used and whether a party falsified his or her identity in order to attack a deponent's credibility", "there is no need to delve into why the deponent engaged in such untruthful behavior."); *see also First Wireless Group, Inc.,* 2007 WL 586720 at *4 ("Defendant can still impeach Claimants through means other than false social security numbers, i.e., false names. These other ways need not relate to the Claimants' immigration status or social security numbers."). As such, defendants may reconvene plaintiffs' depositions to ask plaintiffs questions regarding whether they used a false name or alias, to the extent plaintiffs' counsel previously instructed a plaintiff not to answer such questions.

### E. *Rule 68 Offer*

 On March 17, 2006, defendants made a Rule 68 Offer of Judgment to plaintiffs. *See* Brasel Aff., Ex. 18 (Rule 68 Offer). Plaintiffs' counsel contacted defendants' counsel to convey that plaintiffs were no longer accepting the Rule 68 Offer. *See* Brasel Aff., ¶ 2. Subsequently, defendants' counsel asked questions of plaintiffs Garcia, Pachecho and Reyes as to whether they had knowledge of the Rule 68 Offer:

*Plaintiff Garcia:*

Q. "[D]id you know that you were offered money by ABM to settle a lawsuit that you don't even know that you're in?"

MR. CUMMINS: Ms. Garcia, do not answer that question. I'm instructing you not answer. It's going to attorney/client privilege communications.

Brasel Aff., Ex. 2 (Garcia Dep.) at p. 222.

*Plaintiff Pachecho:*

Q. [W]ere you aware that last March of '07, the company had offered to pay you some money?

MR. CUMMINS: Ms. Pachecho, I'm going to instruct you again not to answer, and I'm objecting as seeking attorney-client privileged communications.

\* \* \*

Q. Ms. Pachecho, I'm asking if you were aware that the company had filed a document offering you $30,000

MR. CUMMINS: Ms. Pachecho, same objections, same instruction not to answer.

MS. SCHULTZ: On what basis? This is a public document.

MR. CUMMINS: This is going to attorney-client privileged communications. Yes, it is.

MS. SCHULTZ: This is going to this woman's understanding of what she has been offered in a public document.

MR. CUMMINS. Ms. Pachecho, I'm making the same instruction based on the same objection.

BY MS. SCHULTZ:

Q. Ms. Pachecho, are you, do you have some understanding of whether ABM made an offer to you last March of '07?

MR. CUMMINS. Ms. Pachecho, I'm instructing you not to answer, and I'm objecting on the same grounds.

MS. SCHULTZ: Have you ever heard that number before?

MR. CUMMINS. Do not answer, Ms. Pachecho. I'm instructing you not to answer based on attorney-client privileged communications.

MS. SCHULTZ: This has nothing to do with attorney-client privileged communica-

tions. This has to do with you [sic] ever conveyed this Rule 68 to your client, an I'm entitled to ask, because this women's eye lit up when I asked her about that.

\* \* \*

BY MS. SCHULTZ:

Q. Ms. Pachecho, if you had understood that your employer had offered you $30,000 to dismiss this lawsuit, would you have taken it?

MR. CUMMINS: Objection. Ms. Pachecho. I'm instructing you not to answer pursuant to attorney-client privilege. Counsel, are you insisting on going down this line?

Brasel Aff., Ex. 9 (Pachecho Dep.) at pp. 514–16, 522–23.

Plaintiffs' counsel then terminated Pachecho's deposition, on the basis that defendants' counsel would not agree to move onto another subject and stop asking Pachecho questions regarding whether she had seen the Rule 68 Offer. *Id.* at pp. 524–25.

*Plaintiff Reyes:*

Q. Ms. Reyes, are you aware that you have been offered money in this lawsuit?

MR. CUMMINS: Ms. Reyes, do not answer that question. I instruct you not to answer. That's getting to attorney/client privileged communications and beyond the scope.

\* \* \*

Q. Ms Reyes, were you aware that you were offered by the defendants some $12,000?

MR. CUMMINS: Ms. Reyes, do not answer that question for the same reasons. I'm instructing you not to answer.

\* \* \*

BY MS. SCHULTZ:

Q. Ms Reyes, are you aware that you rejected an offer of $12,000?

MR. CUMMINS: Same instruction, Ms. Reyes, and the same grounds.

\* \* \*

BY MS. SCHULTZ:

Q. Ms. Reyes, prior to just today in my discussion with you here, have you ever understood that you have been offered this kind of money to dismiss this law suit?

MR. CUMMINS: Objection, do not answer, Ms. Reyes. That's going to attorney/Client privileged documents and beyond the scope.

BY MS. SCHULTZ:

Q: And Ms. Reyes, I'm asking you if you had that understanding from anyone? In other words, prior to just a few minutes ago, have you understood from anyone that you have been offered $12,250 to dismiss or withdraw your lawsuit?

MR. CUMMINS: Ms. Reyes, in answering that question, I'm going to counsel you not to reveal any conversations or communications between you and your lawyers. So to be clear, you can answer the question, but you cannot talk about anything that you talked about with your lawyers. You can reveal what you've talked about with other people and not with your lawyers.

\* \* \*

BY MS. SCHULTZ:

Q. Ms. Reyes, do you know yourself that you rejected an offer of settlement?

MR. CUMMINS: Ms. Reyes do not answer that question for the same reasons.

MS. SCHULTZ: The basis?

MR. CUMMINS: Same reasons.

MS. SCHULTZ: Attorney/client privilege?

MR. CUMMINS: Beyond the scope.

MS. SCHULTZ: And attorney/client privilege?

MR. CUMMINS: And beyond the scope?

MS. SCHULTZ: So both?

MR. CUMMINS: Yes.

Brasel Aff., Ex. 11 (Reyes Dep.) at pp. 524–40.

Towards the end of Reyes' deposition, plaintiffs' counsel asked Reyes:

"[D]o you recall receiving a letter from me in Spanish in the spring of this year regarding an offer made by the employer to resolve or settle the claims to settle the case?"

THE INTERPRETER: No, I don't remember.

BY MR. CUMMINS:

Q. Do you recall discussing with me and the others in my office about the offer made by the company, ABM to try to settle the case, to resolve the case?

THE INTERPRETER: I don't remember, but—but I don't remember.

*Id.* at pp. 598–99.

Defendants argued that the questions they posed to plaintiffs regarding the Rule 68 Offer went to plaintiffs' awareness of the offer and not to the legal opinions or strategy related to the offer. *See* Defs.' Compel Mem. at p. 29. In addition, defendants asserted that plaintiffs' counsel knowingly waived the attorney-client privilege as it relates to questions pertaining to plaintiffs' awareness, understanding and personal beliefs surrounding the Rule 68 Offer, given counsel's communications with plaintiffs during their depositions regarding the offer. *Id.* at pp. 29–30.

Plaintiffs countered that their knowledge of the Rule 68 Offer was not reasonably calculated to lead the discovery of admissible evidence, as evidence regarding an offer of judgment and the rejection of such an offer are not admissible under Rule 68 of the Federal Rules of Civil Procedure and Rule 408 of the Federal Rules of Evidence. *See* Pls.' Opp. Mem. at pp. 37–38. Plaintiffs also maintained that questions regarding whether they received or had knowledge of the Rule 68 Offer, improperly delved into communications protected by the attorney-client privilege. *Id.* at p. 39. As to waiver of the attorney-client privilege, plaintiffs contended that counsel's clarification of testimony made by Reyes after being badgered by defendants' attorney regarding the Rule 68 Offer should not be considered a waiver of the attorney-client privilege as to Reyes or the other plaintiffs. *Id.* n. 1.

Defendants' motion to compel discovery surrounding plaintiffs' respective knowledge of the Rule 68 Offer directed to each of them is denied. First, defendants have not even provided any explanation as to how plaintiffs' knowledge of the Rule 68 Offer, or lack thereof, could lead to the discovery of admissible evidence at trial. Rule 68 provides that "an offer not accepted shall be deemed withdrawn and evidence thereof is not admissible except in a proceeding to determine costs."

Fed.R.Civ.P. 68. Further, Rule 408 bars evidence of offers to compromise when used "to prove liability ... or [the] invalidity of the claim or its amount." Fed.R.Evid. 408. While Rule 408 does not require exclusion when the evidence is offered for another purpose, defendants have not communicated what that purpose is. This Court concludes that the defendants' Rule 68 questions are not relevant to any claim, defense or the subject matter of the suit, and appear to have been made in for the purpose of bypassing plaintiffs' counsel and have settlement discussions directly with plaintiffs.

This Court further finds that defendants' deposition questions regarding plaintiffs' knowledge of the Rule 68 Offer delved into communications between a client and her attorney. Plaintiffs' awareness of the offer was predicated on what their attorney communicated to them about the offer, given that offer was served on plaintiffs' counsel, and not on plaintiffs. *See* Brasel Aff., Ex. 18 (Rule 68 Offer). As such, defendants cannot question plaintiffs regarding their awareness of a Rule 68 Offer without intruding on attorney-client communications.

However, this Court finds that the objections, including those based on the attorney-client privilege, with regards to whether Reyes received, or had knowledge of the Rule 68 Offer has been waived. "Voluntary disclosure of attorney client communications expressly waives the privilege." *United States v. Workman,* 138 F.3d 1261, 1263 (8th Cir.1998) (citing *Lutheran Medical Center v. Contractors Health Plan,* 25 F.3d 616, 622 (8th Cir.1994); *In re Grand Jury Proceedings Subpoena to Testify to Wine,* 841 F.2d 230, 234 (8th Cir.1988)). Courts typically apply such a waiver to all communications on the same subject matter. *See PaineWebber Group, Inc. v. Zinsmeyer Trusts Partnership,* 187 F.3d 988, 992 (8th Cir.1999) (citation omitted). Plaintiffs' counsel asked Reyes if she recalled receiving a letter from him in Spanish regarding the Rule 68 Offer made by defendants and whether she recalled talking with him about the offer made by defendants. *See* Brasel Aff., Ex. 11 (Reyes Dep.) at p. 599. In both instances, Reyes stated that she did not remember

receiving a letter or talking to counsel regarding the offer. *Id.* This exchange between counsel and Reyes during her deposition as to whether she received information from counsel regarding the Rule 68 offer served to waive any objections Reyes had to the questions pertaining to her knowledge of an offer and whether an offer had been made. As such, defendants may reconvene Reyes' deposition for the limited purpose of asking her about whether she had knowledge of the Rule 68 Offer. This includes what her attorney told her about Rule 68 Offer. This waiver, however, will not be deemed to extend to any other plaintiffs, and therefore, defendants' motion to compel as it relates to the Rule 68 Offer and the deposition testimony of Garcia and Pachecho is denied. *See Diversified Industries, Inc. v. Meredith*, 572 F.2d 596, 602 (8th Cir.1977) (" 'where legal advice of any kind is sought from a professional legal advisor in his capacity as such, the communications relevant to that purpose, made in confidence by the client, *are at his instance permanently protected from disclosure by himself or by the legal advisor* except the protection be waived.' ") (quoting *Wonneman v. Stratford Securities Co.*, 23 F.R.D. 281, 285 (S.D.N.Y.1959)) (emphasis added).

Defendants have also asked this Court for permission to complete the depositions of Garcia and Pachecho, which were terminated due counsel's insistence on asking questions regarding the Rule 68 Offer. *See* Defs.' Mem. at p. 34. Assuming that defendants had other topics to cover with each plaintiff and the 14-hour time limit for their respective depositions had not been fully expended, defendants may schedule the depositions of Garcia and Pachecho to complete their depositions.

### F. *Discovery on Damages*

■ In their Rule 26 disclosures, plaintiffs provided a computation of any category of damages claimed, pursuant to Rule 26(a)(1)(C), as follows:

(1) Economic Damages

Plaintiffs have sustained economic damages due to differential terms and conditions of employment, including, but not limited to, the evident limitation on opportunities to be promoted to a supervisory position. As Defendant possesses key documents probative of economic damages—and given that discovery and adverse treatment are ongoing—it is difficult to state with precision the total amount of these damages sustained by Plaintiffs. Plaintiffs intend to supplement their disclosures as discovery proceeds and to prove the full amount of their damages at trial.

(2) Other damages

Plaintiffs have suffered "garden variety" emotional distress, mental anguish, personal embarrassment, and humiliation due to Defendant's employment policies and practices, which have subjected Plaintiffs to severe and pervasive sex harassment, discrimination, and retaliation. As Defendant possesses key information probative of these damages—and given that discovery and adverse treatment are ongoing—it is difficult to state with precision the total amount of these damages sustained by Plaintiffs. Plaintiffs intend to supplement their disclosures as discovery proceeds and to prove the full amount of their damages at trial.

Brasel Aff. Ex. 24 (Plaintiffs' Rule 26 disclosures).

Defendants subsequently served an interrogatory asking plaintiffs to detail the damages they were claiming. The interrogatory and plaintiffs' response were as follows:

**INTERROGATORY NO. 7:** For any and all damages you claim in this action, set forth in detail the nature, dollar amount and basis for each item of claimed damages including injunctive relief sought, and describe in detail for each such damage claim the manner or method by which it was calculated or determined.

**ANSWER:** Plaintiffs state they are seeking injunctive relief that prohibits Defendant from sexually harassing, discriminating against, and retaliating against them and other female janitors employed by Defendant. Plaintiffs also seek a Court Order compelling Defendant to adopt and implement affirmatively employment policies and practices that fully comply with the federal and state civil rights laws.

Plaintiffs further seek injunctive relief in the form of ongoing Court jurisdiction until Defendant has completely remedied its improper policies and practices. Each Plaintiff has suffered significant "garden variety" emotional distress, and each seeks in excess of $100,000 in compensatory damages for a total of more than $1.1 million in such damages (which is subject to a multiplier) as well as punitive damages and civil penalties. As adverse treatment has continued and the litigation and discovery are ongoing, it is difficult to state with precision the full amount of damages sustained. Plaintiffs intend to prove the full amount at trial and will supplement their Answer accordingly.

*See* Brasel Aff. Ex. 1.

On June 12, 2007 defendants' counsel sent an email to plaintiff's counsel asking how much plaintiffs were seeking in economic damages and in damages for emotional distress:

As we review your Rule 26(a)(1)(C) disclosure and your response to Interrogatory No. 7, it is unclear to us what damages you will be seeking at trial. Are you seeking economic damages, and if so, in what amount? Second, are you also going to ask for a specific amount as compensation for alleged emotional distress, or leave it to the jury? We have assumed, based on your responses, that you will not be seeking a specific amount at trial, but please let us know, as we are trying to assess whether to include this point in a motion to compel, and we'd like to avoid it if possible.

Brasel Aff. Ex. 19. Plaintiffs' (June 12, 2007 email from Brasel to Cummins).

Plaintiffs' response to this inquiry on damages was as follows:

As previously stated verbally and in writing, the 11 women we represent are not seeking economic damages in this case. In addition, I reiterate that our 11 clients seek significant non-monetary relief here. As to emotional distress damages, they are difficult to quantify with precision in sex harassment, discrimination, and retaliation cases like this. Given how the evidence has been uncovered to date and how courts have ruled in these cases, however, the 11

women's recovery at trial should be substantial.

We believe that recovery for emotional distress alone will be at least $1.1 million and likely much more because of the repeated and reckless disregard shown by your client for its legal obligations and for the safety of our 11 clients as well as other female employees in Minnesota.

\* \* \*

It would be premature now to attempt to state exactly how much damages (emotional distress and punitive) will be requested and recovered at trial because factual discovery and litigation continue. The 11 women we represent will prove the full amount of damages at trial and reserve the right to supplement their discovery responses further in that regard. *On behalf of our 11 clients, we also reserve the right to request specific amounts of damages from the jury at trial.*

*Id.* (June 13, 2007 email from Cummins to Brasel) (emphasis added).

Defendants seek an order from this Court compelling plaintiffs to disclose a computation of their emotional distress damages because they have indicated that the may seek a specific amount of damages from the jury. *See* Defs.' Compel Mem. at p. 35. Plaintiffs claim that emotional distress damages are difficult to measure and that "as masters of their case," they have the right to determine whether to ask for a specific amount of damages at trial. *See* Pls.' Opp. Mem. at pp. 47–48.

Rule 26(a)(1)(C) requires a party to disclose "a computation of *any* category of damages claimed …, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered." Fed.R.Civ.P. 26(a)(1)(C) (emphasis added).

At least one Court has found that the clear language of Rule 26(a)(1)(C) requires a party alleging emotional distress damages to provide a calculation for compensatory emotional

distress damages. *See Dixon v. Bankhead,* No. 4:00CV344–WS, 2000 WL 33175440 at \*1 (N.D.Fla. Dec.20, 2000) ("If Plaintiff is permitted to testify to his intangible emotional harm, as he should be, he surely can place a dollar value on that from his own perspective. He is in a better position to do this than the jury.").

Other courts have concluded that a plaintiff need not provide a calculation for compensatory damages pertaining to emotional distress, as such calculations are necessarily vague and may not be amendable to the type of calculation disclosure contemplated by Rule 26(a)(1)(C). *See Williams v. Trader Publishing, Co.,* 218 F.3d 481, 486 n. 3 (5th Cir.2000) ("Since compensatory damages for emotional distress are necessarily vague and are generally considered a fact issue for the jury, they may not be amenable to the kind of calculation disclosure contemplated by Rule 26(a)(1)(C)."); *see also Creswell v. HCAL Corp.,* No. 04cv388 BTM (RBB), 2007 WL 628036 at \*2 (S.D.Cal. Feb. 12, 2007) ("While Rule 26 generally requires a party to provide a computation of such damages, emotional damages, because of their vague and unspecific nature, are oftentimes not readily amenable to computation."); *Gray v. Florida Dept. of Juvenile Justice,* No. 3:06–cv–990–J–20MCR, 2007 WL 295514 at \*2 (M.D.Fla. Jan.30, 2007) ("[C]ompensatory damages for emotional distress may not be susceptible to computation and thus, it is within the jurors ability to determine a reasonable amount. As such, Plaintiff is not required to provide Defendant with a calculation of her suggested compensatory damages for emotional distress pursuant to Rule 26(a)(1)(C).") (internal citation omitted); *Burrell v. Crown Central Petroleum, Inc.,* 177 F.R.D. 376, 386 (E.D.Tex.1997).

And still other courts have determined that a plaintiff need not provide a calculation for compensatory damages pertaining to emotional distress, predicating their decision on the fact that plaintiff did not intend to suggest to the jury a specific amount of money that the plaintiff deems appropriate for emotional damages. *See Merrill v. Waffle House, Inc.,* 227 F.R.D. 467, 470 (N.D.Tex.2005) ("In this case, Plaintiffs state that they do not intend to ask the jury for a specific dollar amount of damages at trial . . . Based on this representation and the Fifth Circuit's holding in *Williams,* Plaintiffs will not be required to disclose a computation of damages at this time."); *see also Gray,* 2007 WL 295514 at \*2 (noting that plaintiff did not intend to suggest an amount to the jury for emotional distress damages).

In this case, plaintiffs have represented that they "reserve the right to request specific amounts of damages from the jury at trial." Brasel Aff. Ex. 19. To the extent that plaintiffs do not intend to suggest a specific amount to the jury for emotional distress damages, this Court will not require them to disclose a computation of these damages. However, if plaintiffs do intend to suggest a specific amount to the jury for emotional distress damages, plaintiffs shall be required to provide to defendants the basis for this figure. After all, if plaintiffs present a specific amount to the jury for compensatory damages, then presumably they have a basis and a means for arriving at the amount they are seeking. In short, in that situation, the calculation for emotional distress damages is not necessarily vague, and it would be unfair to defendants if plaintiffs could submit a specific dollar amount for damages to the jury without defendants having the opportunity to discover the basis for the claim and the opportunity before trial to rebut that basis. Further, this Court will not allow plaintiffs to wait until the eve of trial to provide defendants with this information. This case has been ongoing since May, 2006 and plaintiffs should have some idea of the amount they wish to seek for emotional damages. As such, to the extent that plaintiffs intend to suggest a specific amount to the jury for emotional distress damages, they shall have until December 1, 2007 to provide a calculation for compensatory damages in compliance with Rule 26(a)(1)(C) and in response to Interrogatory No. 7.[12] If plaintiffs do not provide this information by this date,

---

**12.** Defendants will then have an opportunity to address this calculation, if they so choose, in

their expert disclosures.

they will not be allowed to suggest a specific amount to the jury for emotional distress damages.

### G. *Additional Time for Discovery Relating to the Disclosure of a New Witness by Plaintiffs*

██. Defendants asserted that on June 8, 2007, after the May 1, 2007 deadline for fact discovery, plaintiffs served on them the May 10, 2007 Affidavit of Aldo Terrazas, not previously disclosed by plaintiffs. *See* Defs.' Compel Mem. at p. 24; Brasel Aff., Ex. 25 (June 8, 2007 Letter from Cummins to Defendants' Counsel attaching Supplemental Discovery responses including the Affidavit of Aldo Terrazas); *see also* Second Amended Scheduling Order [Docket No. 162]. They have asked this Court for an extension of the discovery schedule for the limited purpose to allow them to subpoena Terrazas for deposition and document production. *Id.* at p. 35. This Court finds good cause to extend fact discovery to allow defendants to conduct discovery pertaining to a potential witness that they were made aware of only after the close of discovery.

This deposition of Terrazas shall be completed by the deadline set forth in the Third Amended Pretrial Scheduling Order issued contemporaneously with this Order.

### H. *Request for Attorneys' Fees and Costs*

██ With respect to defendants' request for attorneys' fees and costs incurred in connection with bringing their motion to compel, this motion is granted as it relates to plaintiffs' refusal to provide the requested medical information, authorizations and records previously required by this Court's September 21, 2006 Order. Under Rule 37(a)(4)(B), a party moving to compel discovery may recover attorneys' fees and costs under the following conditions: "(1) an order compelling discovery; (2) a willful violation of that order; and (3) prejudice to the other party." *Everyday Learning Corp. v. Larson*, 242 F.3d 815, 817 (8th Cir.2001) (emphasis added) (quoting *Keefer v. Provident Life & Accident Ins. Co.*, 238 F.3d 937, 940 (8th Cir.2000));

*see also Chrysler Corp. v. Carey*, 186 F.3d 1016, 1019 (8th Cir.1999).

In this case, this Court's September 21, 2006 Order explicitly stated that defendants were "entitled to discover those medical records that reflect mental health issues, *and the manifestations of those mental health issues,* ..." (emphasis added). Plaintiffs have refused to provide additional information, medical records and authorizations for medical records with regards to these various manifestations, as testified to during their depositions. Instead of complying with this Court's Order, plaintiffs reargued virtually the same position that was rejected by the Court in conjunction with their motion for a protective order.

As such, this Court finds that plaintiffs willfully failed to comply with its September 21, 2006 Order. Additionally, this Court finds that plaintiffs' failure to abide by this Court's Order has resulted in prejudice to defendants in the form of having to expend money and resources to ensure plaintiffs' compliance with the discovery order, and has impeded defendants' ability to defend its interests.

In light of the Court's findings that there was an order compelling discovery, a willful violation of that order, and prejudice to defendants, sanctions under Fed.R.Civ.P. 36(b)(2) are warranted. As such, plaintiffs shall pay to defendants the costs and attorney's fees associated with bringing this part of their motion to compel, including attendance at that portion of the hearing on the motion to compel that related to seeking the medical information and records. Defendants' counsel shall submit an affidavit to this Court by November 8, 2007, setting forth in detail the hours expended by each attorney and legal assistant on this part of the motion to compel, their respective hourly rates, and the amount of costs and fees incurred. Plaintiffs will not be required to pay for the continuation of their depositions. The Court will then issue a subsequent order awarding to defendants their reasonable attorneys' fees and costs as a sanction for plaintiffs' violation of its Order.

As to defendants' request for attorneys' fees and costs incurred in connection with

the balance of their motion to compel, their motion is denied. Rule 37(a)(4)(A) provides:

> If the motion is granted or if the disclosure or requested discovery is provided after the motion was filed, the court shall, after affording an opportunity to be heard, require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in making the motion, unless the court finds that the motion was filed without the movant's first making a good faith effort to obtain the disclosure or discovery without court action, or that the opposing party's nondisclosure, response, or objection was substantially justified, or that other circumstances make an award of expenses unjust.

Fed.R.Civ.P. 37(a)(4)(A).

The Court does not find that the balance of plaintiffs' nondisclosures, responses, or objections were substantially unjustified. Therefore, this Court finds that under the circumstances of this case, an award of attorneys' fees and expenses is not warranted.